**PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY**

v.

James KNOTT, M.D.

No. 02–0485.

Supreme Court of Texas.

Argued March 19, 2003.

Decided Dec. 19, 2003.

Rehearing Denied Feb. 13, 2004.

Mark Alexander, McAllen, for Estate of Ellis Garlan Gatlin.

Patrick C. Frank, Fiedler Akin Frank & Carlton, P.C., Plano, for Debra Lucille Townley.

Mark T. Davenport, Andrew C. Whitaker, Figari Davenport & Graves, LLP, Dallas, for petitioner.

Ben C. Martin, Law Office of Ben C. Martin, Dallas, for respondent.

Justice WAINWRIGHT delivered the opinion of the Court.

In this insurance coverage dispute, we construe the definition of total disability found in two insurance policies. Interpreting the policies as they are written, we hold that an insured is totally disabled when he is unable to perform all of the important and usual duties of his occupation. Because the insured in this case was able to perform some of the important and usual duties of his occupation as a physician, he was not totally disabled under the policies' terms. We also conclude that the insured's extra-contractual claims are barred by limitations. The trial court was correct in granting the motions for summary judgment. Accordingly, we reverse the judgment of the court of appeals in part and affirm in part.

## I. Factual and Procedural Background

In 1968, Dr. James Knott began practicing obstetrics and gynecology with Dr. Robert Kuhne. Around 1970, the doctors formed a professional association, Kuhne & Knott Gynecological Associates, which was eventually renamed Richardson Women's Clinic.

In the early 1970s, Knott met with Ellis Garland Gatlin, an insurance agent, to discuss buying disability insurance. Knott eventually bought two policies: one issued in 1970 and a second policy issued in 1974. The policies, as amended, provided bene-

fits for total disability and partial disability, among other things.

In June 1985, Knott suffered a spine fracture in a plane crash and underwent surgery (a thoracolumbar fusion) to stabilize the fracture. Knott was unable to return to work until August 1985. On December 19, 1985, Knott submitted a claim to Provident for benefits for total disability under both policies. At the time of his claim, Knott acknowledged that he was working part-time seeing gynecological patients, conducting pelvic exams, providing consulting services to other physicians, and performing administrative duties. However, he claimed that he was unable to perform operative obstetrics, prolonged gynecological procedures, endoscopic procedures, and vaginal procedures because the bending and stress of these procedures aggravated his back injury. Within five days of receipt of Knott's claim, Provident issued Knott a check for $7500 in total disability benefits. However, in a letter dated February 19, 1986, Provident requested repayment of the $7500, less $1250 in benefits, because Knott had failed to satisfy the "90–day elimination period," which was a condition of coverage. The ninety-day elimination period refers to a requirement that the total disability continue for more than ninety days, and benefits, if any, would commence on the ninety-first day of a covered disability. According to a November 20, 1985 medical report completed by Dr. George Wharton, Knott's treating physician, and submitted to Provident in support of Knott's claim, Knott was totally disabled from June 9, 1985 through August 4, 1985. The statement of claim that Knott submitted to Provident, dated December 19, 1985, indicates that Knott believed himself to be totally disabled from June 9, 1985 to the date of the claim.

The parties negotiated this dispute, which culminated in a solution described in Provident's March 21, 1986 letter to Knott. The March letter stated that Provident would treat Knott's claim "on a residual basis,"[1] waive Knott's premiums as long as he was disabled, and waive repayment of the $7500. Under this arrangement, Knott continued to submit claims for benefits through 1989, and Provident continued to pay benefits.[2] In 1991, Provident informed Knott that he no longer qualified for residual benefits and that Provident planned to resume billing him for his premiums. Provident had discontinued billing for these premiums while Knott was receiving benefits under the policy. Knott retained an attorney who negotiated the payment of premiums with Provident, and, apparently, Provident agreed to continue to waive Knott's premium payments. Knott did not submit another claim until December 1995. Provident did not pay Knott any additional benefits until 1996.

Except for a two-month period immediately following the 1985 plane crash, Knott worked as a physician from 1985 through 1995, performing all of his pre-accident duties except for certain surgical and office examination procedures. On August 20, 1995, Knott turned sixty-five. A few months later, on December 15, 1995, Knott submitted a claim for total disability to Provident. No new event or accident pre-

---

1. Under the residual disability provision of the policies, a qualifying insured may receive benefits according to the following formula: (loss of monthly income divided by the prior monthly income) times the maximum monthly benefit for total disability available under the policy.

2. Because Knott's claims were handled on a residual basis, and were therefore based on Knott's income, Knott was required to submit periodic reports about his income to Provident for processing.

cipitated the claim. After the ninety-day elimination period was satisfied, Provident began to pay Knott benefits under the policies. Provident made total disability payments to Knott for twenty-four months. Then, in a letter dated March 11, 1998, Provident notified Knott that it was closing his claim because it had paid him the maximum benefits to which he was entitled.

Under the "policy schedule" in both disability insurance policies at issue, the maximum benefit period for total disability commencing on or after the insured's sixty-fifth birthday is twenty-four months. An insured who has a total disability that commences prior to his sixty-fifth birthday is entitled to lifetime benefits under the policies. In August 1998, Knott sued Provident and the executrix of Gatlin's estate[3] for breach of contract, misrepresentation, breach of the duty of good faith and fair dealing, violations of the Texas Insurance Code and violations of the Texas Deceptive Trade Practices Act ("DTPA").

Provident and Gatlin filed motions for summary judgment. Provident argued that it was entitled to summary judgment on Knott's breach of contract claim under three alternative theories: (1) Provident did not breach the insurance contract because Knott's disability commenced after his sixty-fifth birthday; (2) Knott is not totally disabled; and (3) federal law preempts the contract claim. Provident also argued that summary judgment was proper on Knott's bad faith and statutory claims on several alternative bases: (1) Provident did not breach the policies; (2) Provident had a reasonable basis for its decision to close Knott's claim; (3) the

applicable statutes of limitation and the Dead Man's Rule bar the claims; (4) federal law preempts Knott's claims; and (5) Provident did not make any misrepresentations that were the producing cause of Knott's damages. Gatlin sought summary judgment on several alternative grounds including statute of limitations, the Dead Man's Rule, no evidence that Gatlin violated the DTPA, and lack of privity of contract, among other defenses. Knott did not move for summary judgment.

The trial court granted Provident's and Gatlin's motions for summary judgment without specifying the grounds for its judgment. The court of appeals reversed the trial court's judgment on Knott's breach of contract claim against Provident,[4] remanding the claim to the trial court, but affirmed the trial court's judgment on the remaining claims (misrepresentation, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code and the DTPA). 70 S.W.3d 924. Provident and Knott petitioned this Court for review.

## II. Standard of Review

We review the trial court's summary judgment de novo. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex.2000). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002); *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997). Under Texas Rule of

---

3. Gatlin died before Knott filed this lawsuit. Knott sued Debra Lucille Townley, as independent executrix of the Estate of Ellis Garland Gatlin.

4. Knott's petition does not challenge the court of appeals' disposition of his breach of contract claim against Gatlin. The court of appeals affirmed the trial court's summary judgment on this claim; therefore, this opinion does not address it.

Civil Procedure 166a(c), the party moving for summary judgment bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Haase v. Glazner*, 62 S.W.3d 795, 797 (Tex.2001); *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex.1999).

Because the trial court's order does not specify the grounds for its summary judgment, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex.1996); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989).

### III. Total Disability

We begin by reviewing the central issue in this case—the interpretation of total disability as defined in the insurance policies. Both of the policies contain the following definition of total disability: "Total Disability means that due to Injuries or Sickness, you are unable to perform the duties of your occupation."[5] Provident argues that under this provision, Knott is totally disabled only when he is unable to perform all of the duties of his occupation. Provident explains that it did not breach its insurance contract with Knott because he was able to perform some of his duties as a physician and, therefore, was not totally disabled under the policies' definition as a matter of law. Knott argues that whether he is totally disabled is a fact question that depends on whether he is unable to do any substantial portion of the work connected with his occupation. Knott contends that this interpretation of total disability in an insurance contract was articulated by this Court in *Pruden-*

*tial Ins. Co. v. Tate*, 162 Tex. 369, 347 S.W.2d 556 (1961), and controls this case. The court of appeals relied on Tate to conclude that the determination of total disability in this case was "inherently a fact issue" and reversed the trial court's judgment on Knott's breach of contract claim. 70 S.W.3d at 931. For reasons explained below, we reverse the judgment of the court of appeals and conclude that Provident has met its summary judgment burden to establish that Knott was not totally disabled under the policies' language.

### A. Applicable Law and Policy Provisions

In interpreting these insurance policies as any other contract, we must read all parts of each policy together and exercise caution not to isolate particular sections or provisions from the contract as a whole. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex.1995); *Gen. Am. Indem. Co. v. Pepper*, 161 Tex. 263, 339 S.W.2d 660, 661 (1960); *see Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 156, 157 (2003). Viewing the policy in its entirety furthers our objective to give effect to the written expression of the parties' intent. *Tex. Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex.1999) (citing *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex.1998); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.1994)).

The definitions of partial disability in each policy are instructive in interpreting the total disability definition. The 1974 policy provides as follows:

> DEFINITION OF PARTIAL DISABILITY: As used in this policy, the term "Partial Disability" means:

---

5. This definition reflects amendments to the policies made in March 1982 which apply to all covered claims resulting from periods of disability originating on or after October 1, 1981. The plane crash that caused Knott's injuries occurred in June 1985.

(a) your inability to perform one or more of your important daily business duties, or

(b) your inability to perform your usual daily business duties for at least one-half of the time usually required for the performance of such duties.

The 1970 policy contains parallel language:

PART 4. PARTIAL DISABILITY—ACCIDENT: If injuries shall either prevent the Insured from performing one or more, but not all, important daily business duties, or shall prevent the Insured from performing his usual daily business duties for at least one-half, but not all, of the time usually required for the performance of such duties, the Company will pay periodically during the continuance of such partial disability, indemnity at the rate of the Monthly Benefit for Partial Disability beginning on the day benefits for accident commence....

The policies define total disability as an inability "to perform the duties of your occupation." Taking the total disability and partial disability provisions together, we conclude that under the Provident policies, an insured is totally disabled when he is unable to perform all of the important duties of his occupation.

■ The partial disability clause provides defined benefits to an insured who (1) cannot perform some, but not all, of his important daily business duties or (2) is unable to perform his usual daily business duties for at least one-half, but not all of the time usually required. In these insurance policies, partial disability is defined by the inability to perform at least one important or usual duty of the insured's business at least some of the time. Under these policies, total disability exists when the insured is unable to perform all of the important daily duties of his occupation.[6] This interpretation of the provisions harmonizes the definitions of partial and total disability and avoids inconsistent and redundant applications. *See Forbau*, 876 S.W.2d at 133–34. We also give effect to the expressed intent of the parties in the policy as a whole, rather than interpret one provision in isolation. *Beaston*, 907 S.W.2d at 433.

Knott cites several cases for the proposition that a common law definition of total disability should override the parties' agreement. *See Tate*, 347 S.W.2d at 557–58; *Commonwealth Bonding & Cas. Ins. Co. v. Bryant*, 113 Tex. 21, 240 S.W. 893, 893 (1922); *Great S. Life Ins. Co. v. Johnson*, 25 S.W.2d 1093, 1097 (Tex. Comm'n App.1930, holding approved).[7] Based on these cases, Knott argues that an insured is totally disabled whenever he is unable to perform any substantial portion of the work connected with his occupation. These cases are distinguishable on their facts or do not follow recognized rules of contract interpretation.

---

**6.** The policy makes specific exceptions to provide total disability benefits for certain catastrophic disabilities, including the total and irrecoverable loss of sight, speech, hearing, both hands, both feet, or one hand and one foot, regardless of whether the insured otherwise qualifies for total disability under the policy. None of these catastrophic disabilities are at issue in this case.

**7.** We note that our previous approval of the holding of a Texas Commission of Appeals decision indicates the Court's approval of the judgment and each holding of the Commission but not necessarily the reasoning expressed in the decision. *McKenzie v. Withers*, 109 Tex. 255, 206 S.W. 503, 503 (1918). Thus, this Court's approval of the Texas Commission of Appeals' decision in *Johnson* did not indicate our agreement with its reasoning. Nevertheless, because the court of appeals and the Court in *Tate* analyzed *Johnson*, we discuss it also. 70 S.W.3d at 930–31.

In light of Knott's arguments and the court of appeals' reliance on these cases, we review the *Bryant, Johnson,* and *Tate* opinions. In *Bryant* the insurance policy provided for a weekly indemnity if bodily injuries " 'wholly disable and prevent the insured from performing any and every kind of duty pertaining to his occupation.' " 240 S.W. at 893. The policy provided one-half of the same weekly indemnity " 'if such injury should not wholly disable the insured, as above, but shall immediately (or immediately following total disability) and continuously disable and prevent him from performing one or more important daily duties pertaining to his occupation.' " *Id.* Concerned that "a literal interpretation to the language of this contract ... [would] practically relieve the insurer of all obligation thereunder," the Court interpreted the total disability provision to mean that "the larger indemnity was promised if the injuries rendered the insured substantially unable, in the exercise of ordinary care, to perform every material duty pertaining to his occupation." *Id.* The Court concluded that this interpretation reflected "the real intent and purpose of the contracting parties." *Id.* at 894. However, the Court did not discuss or harmonize its interpretation of the total disability provision of the policy with the partial disability provision.

In *Johnson,* the policy at issue provided for a total disability payment if an insured's injuries rendered him " 'permanently, continuously and wholly prevented from performing any work for compensation or profit or from following any gainful occupation.' " 25 S.W.2d at 1097. First, we observe the substantial differences between the policy language in *Johnson* and this case. The Johnson policy coverage hinged on an insured's ability to perform work in *any* occupation, and the Provident policy concerns the insured's occupation. Thus, the *Johnson* policy's broader language, taken literally, precluded total disability coverage if an insured was able to perform " '*any* work for compensation or profit ... from ... any gainful occupation.' " *Id.* (emphasis added). The court in *Johnson* limited the breadth of the policy at issue, citing the reasoning in *Bryant,* by stating that total disability "does not mean absolute physical disability of the insured to transact any kind of business pertaining to his occupation, but exists if he is unable to do any substantial portion of the work connected therewith." *Id.* Apparently, the court adopted this construction to avoid interpreting the policy as requiring a virtual impossibility, noting that " 'it would scarcely happen that one could live and bring himself within the literal language of the contract.' " *Id.* (quoting *Hefner v. Fid. & Cas. Co. of N.Y.,* 110 Tex. 596, 607, 222 S.W. 966 (1920)). The Johnson Court also addressed the policy language "gainful occupation"—a term not implicated in this case—and eventually concluded that a fact issue existed as to whether a once successful merchant who lost a leg in a shotgun accident was entitled to receive benefits for total disability even though he was able to function as a justice of the peace. *Id.* The Provident policies do not contain the broad language contained in the policies at issue in *Johnson;* the policies do not require Knott to be wholly unable to perform the duties of any occupation but instead are limited to Knott's ability to perform *his* occupation.

Finally, in *Tate,* the Court considered a total disability provision, similar in breadth to the provision in *Johnson.* The *Tate* provision provided total disability benefits if the insured was "wholly, continuously and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value during the remainder of his lifetime." *Tate,* 347 S.W.2d at 558–59. The *Tate*

Court stated that the construction of the provision was controlled by *Bryant* and *Johnson*. *Id.* at 559. However, because the provision at issue in *Tate* precludes coverage if an insured is able to engage in "*any* occupation or . . . work for any kind of compensation of financial value," *Tate*, like *Johnson*, is factually distinguishable from this case. *Id.* at 558–59 (emphasis added).

 We disapprove of language in *Bryant*, *Johnson*, and *Tate* to the extent that the language suggests that it is proper to disregard defined terms in a policy in favor of definitions not expressed in the parties' written agreements. When terms are defined in an insurance policy, those definitions control the interpretation of the policy. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 823 (Tex.1997); *see Schaefer*, 124 S.W.3d at 157, 159, (all provisions of a policy should be given effect so that none are rendered meaningless); *Beaston*, 907 S.W.2d at 433 (each part of the policy should be given effect and no single phrase, sentence, or section should be isolated and considered apart from the other provisions); *accord Forbau*, 876 S.W.2d at 133–34. Reliance on defined terms in insurance policies to construe those contracts is necessary to determine the intent of the parties and integral to the application of basic principles of contract interpretation to insurance policies. *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 519, 522 (Tex. 1995); *Iowa Mut. Ins. Co. v. Faulkner*, 157 Tex. 183, 300 S.W.2d 639, 642 (1957); *see Reconstruction Fin. Corp. v. Gossett*, 130 Tex. 535, 111 S.W.2d 1066, 1074 (1938) ("The object of construing any written instrument is to ascertain the intention of

the parties, and this intention must be determined, if possible, from the language used in the instrument itself."); *see also Ramsay v. Maryland Am. Gen. Ins. Co.*, 533 S.W.2d 344, 346 (Tex.1976); *Guardian Life Ins. Co. of Am. v. Scott*, 405 S.W.2d 64, 65 (Tex.1966). We follow long-standing principles of contract interpretation and apply the definitions contained in the parties' agreement, construing them to give meaning to all of the terms of the policy and adhere to the written expression of the parties' intent.

**B. Analysis**

 Viewing the evidence in the light most favorable to the nonmovant, Knott, we conclude that Provident established as a matter of law that Knott was not totally disabled from a disability that commenced prior to his sixty-fifth birthday. Knott identified his occupational duties for the time period preceding the 1985 plane crash through the time he made his claim for total disability in 1995 as including the following: seeing patients,[8] performing surgery, consulting with other physicians, and performing certain administrative duties. The parties agree that Knott did not perform any of these duties for the two-month period immediately following the crash. Knott testified that he could perform some of these duties, albeit on a part-time basis, when he made his claim for total disability in December 1985. Knott identified certain surgical and office examination procedures that involved bending and stress to his back that he was unable to perform at the time of his December 1985 claim. Likewise, Knott testified that he could perform some of his occupational duties on at least a part-time

8. Knott states that he saw patients as part of an office gynecology practice and as part of an office obstetrics practice relating to diagnosis of infertility issues. However, Knott also testified that he had not practiced general obstetrics since 1980, five years before the plane crash.

basis when he made his claim in December 1995 and admitted that he continued to see patients, perform some types of surgeries, consult with other physicians, and perform certain administrative duties through the date of his deposition in this case. From no later than 1990 to 1995, Knott worked full-time seeing patients, performing some types of surgeries, consulting with physicians, and performing administrative duties. These facts place Knott's claim squarely within the partial disability provision of the policies, as an insured who was unable to perform some, but not all, of his important daily business duties, and outside the scope of the total disability provision. The evidence conclusively establishes that Knott could perform some of the duties of his occupation. Specifically, Knott could see and generally treat patients, perform administrative duties, perform some types of surgery, and consult with other physicians. Provident met its burden to show that Knott was not unable to perform all of the important daily duties of his occupation.

These policies constitute the allocation by market participants of risks and benefits regarding an insured's possible future disability. The Court's role is not to redistribute these risks and benefits but to enforce the allocation that the parties previously agreed upon. *See* 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 31.5 (4th ed.2003). Pursuant to the language of these policies, Knott was not unable to perform all of the important and usual duties of his occupation, and, therefore, he was not entitled to total disability benefits under the policies. Provident met its summary judgment burden on this defense to Knott's breach of contract claim.

## IV. Statute of Limitations

Provident and Gatlin also moved for summary judgment on Knott's extra-contractual claims (misrepresentation, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code and the DTPA) on the basis that they were barred by the applicable statute of limitations. Provident and Gatlin bear the burden to prove their affirmative defense by conclusively establishing the applicability of the statute of limitations, including the date on which the limitations commenced. *Zale Corp. v. Rosenbaum*, 520 S.W.2d 889, 891 (Tex.1975). The parties disagree on the date on which limitations began to run. Knott argues that Provident did not provide him with an outright denial of his claim for total disability until its March 11, 1998 letter or, in the alternative, that the accrual date is a question of fact. Provident and Gatlin argue that limitations began to run as of the letter dated February 19, 1986, to Knott from Provident. Provident's February letter to Knott reads as follows:

Dr. Wharton's office has forwarded attending physician statement that was signed and dated by Dr. Wharton on November 20, 1985. This form indicates dates of disability from June 9 to August 4, 1985 and partial from August 5 to present.

After a careful review of this information it has been determined that the 90 day elimination period was not satisfied, and according to our records we have overpaid your claim in the amount of $7500.00.

However, you would have qualified for the treatment of injury under the provision of your policies in the amount of # 1250.00. [sic]

Since we have already paid $7500.00 of benefits to you, we are subtracting the $1250.00 from the $7500.00 leaving an overpayment of $6250.00.

If you have any questions regarding the refunding of this amount, please contact Mr. Kerr or me. A self-stamped envelope is enclosed for returning the above payment.

██ All of Knott's extra-contractual claims are subject to a two-year limitations period. The statute of limitations governing Knott's cause of action under article 21.21 of the Texas Insurance Code states that suit

> must be commenced within two years after the date on which the unfair method of competition or unfair or deceptive act or practice occurred or within two years after the person bringing the action discovered or, in the exercise of reasonable diligence, should have discovered the occurrence of the unfair method of competition or unfair or deceptive act or practice.

TEX. INS.CODE art. 21.21, § 16(d). Likewise, the statute of limitations governing Knott's misrepresentation cause of action under the DTPA requires that this claim "must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice." [9] TEX. BUS. & COM. CODE § 17.565. A plaintiff's cause of action under the Texas Insurance Code for unfair claims settlement practices or under the DTPA based on denial of insurance coverage accrues on the date that the insurer denies coverage. *Celtic Life Ins. Co. v. Coats*, 885 S.W.2d

96, 100 (Tex.1994). Knott's cause of action for breach of the duty of good faith and fair dealing must be brought within two years of the date on which the cause of action accrued. TEX. CIV. PRAC. & REM. CODE § 16.003(a). Under Texas law, a plaintiff's cause of action for bad-faith breach of a first-party insurance contract accrues at the time the insurer denies the insured's claim. *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex.1990). The fact that damage may continue to occur for an extended period after denial does not prevent limitations from starting to run. *Id.* Thus, all of Knott's extra-contractual claims are governed by a two-year statute of limitations that accrues upon the denial of Knott's claim for total disability benefits under the policies.

██ Under the circumstances of this case, the question of when these causes of action accrued determines whether the statute of limitations has run. Generally, when a cause of action accrues is a question of law. *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex.1990). As a general rule, a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 514 (Tex. 1998) (citing *Murray*, 800 S.W.2d at 828). In most cases, a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur. *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex.1996). However, this Court has suggested that when "there is no outright

---

9. To the extent that Knott pursued a negligent misrepresentation claim against Gatlin for misrepresenting that Knott would receive total disability benefits if he became unable to perform any duty for which he was "duly trained," we conclude that this claim is

barred by the applicable statute of limitations. *See HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 885 (Tex.1998) (noting applicability of two-year statute of limitations for negligent misrepresentation).

denial of a claim, the exact date of accrual of a cause of action ... should be a question of fact to be determined on a case-by-case basis." *Murray*, 800 S.W.2d at 828 n. 2. Here, Knott argues that Provident's February 1986 letter does not constitute an outright denial of Knott's claim for total disability and that the date on which his causes of action accrued is a question of fact. We disagree.

Several courts of appeals have determined what constitutes a denial of a claim in light of our decision in Murray. In *Ehrig v. Germania Farm Mut. Ins. Ass'n*, 84 S.W.3d 320, 325 (Tex.App.-Corpus Christi 2002, pet. denied), the court of appeals applied the reasoning in the Murray footnote and held that whether an insurer's oral denial of an insured's claim constituted an "outright denial" sufficient to trigger the commencement of limitations is a question of fact for the jury's determination, even though the insured does not dispute that the oral statement was made. The court decided that summary judgment was not proper "[w]hen the facts are arguably not clear enough to put the aggrieved party on notice of a legal injury." *Id.* The Fourth District court of appeals limited the reasoning of the Murray footnote to scenarios in which the insurance company " 'strings an insured along without denying or paying a claim.' " *Kuzniar v. State Farm Lloyds*, 52 S.W.3d 759, 761 (Tex.App.-San Antonio 2001, pet. denied). In *Kuzniar*, the insureds filed a claim with State Farm in 1992 regarding a plumbing leak. *Id.* at 760. State Farm opened a claim file and sent an adjuster to investigate the claim, and the adjuster asked the insureds to hire a plumber to investigate the leak. *Id.* Neither State Farm nor the adjuster heard back from the insureds, and in January 1993 State Farm closed the claim file. *Id.* In August 1996, the insureds sued State Farm. *Id.* The court of appeals affirmed the trial

court's summary judgment on the statute of limitations issue, concluding that "[t]he closing of the claim file was an objectively verifiable event that unambiguously demonstrated State Farm's intent not to pay the claim...." *Id.* Finally, in *Mangine v. State Farm Lloyds*, 73 S.W.3d 467, 468 (Tex.App.-Dallas 2002, pet. denied), the insured made a claim under their homeowner's insurance policy for alleged hail damage to their roof. In affirming the trial court's summary judgment based on a statute of limitations defense, the Fifth District court of appeals decided that the adjuster's completed building estimate form, stating that the adjuster found no evidence of hail damage, "conveyed in writing State Farm's determination with respect to the [insureds'] claim for hail damage and the reasons for it," even though the writing did not use the word "denial." *Id.* at 471. The court ultimately concluded that although an insurer's denial of a claim must be in writing, "there are no magic words that must be used to deny a claim." *Id.*

◼◼◼ Although as a general rule, determining the accrual date of a cause of action is a question of law, we acknowledge that the accrual date of a cause of action based on a violation of the Texas Insurance Code, the bad-faith breach of an insurance contract, or a violation of the DTPA involving insurance coverage, may present questions of fact to be determined on a case-by-case basis. However, we are not faced with such a situation in this case. We do not require an insurer to include "magic words" in its denial of a claim if an insurer's determination regarding a claim and its reasons for the decision are contained in a clear writing to the insured. See TEX. INS. CODE art. 21.55, § 3(a),(c). In this case, Provident's February 1986 letter conveyed its denial of

Knott's claim for total disability and the reasons for its decision to reject the claim.

As of the time of the February letter, Provident had paid Knott $7500 in total disability benefits in response to Knott's claim under the policies. However, the letter also indicates that upon further review of new material received from Knott's treating physician, Dr. Wharton, Provident determined that Knott failed to meet the ninety-day elimination provision of the policy. Taken with Dr. Wharton's November 20, 1985 report, this letter establishes that Provident considered Knott totally disabled only from June 9, 1985 through August 4, 1985, and partially disabled through November 20, 1985, the date of Dr. Wharton's report. Although the letter does not use the word "deny," the letter clearly conveys Provident's position that Knott was not entitled to the $7500 for total disability coverage and that Provident was seeking a reimbursement of the overpayment of benefits. Provident denied Knott's claim for benefits for total disability and instead agreed to provide him with benefits "on a residual basis" in its February 1986 letter. Thus, we agree with the court of appeals that the statutes of limitations for Knott's extra-contractual claims against Provident and Gatlin expired long before he filed suit in August 1998.

## V. Conclusion

Provident established as a matter of law that Knott was able to perform some of the important and usual duties of his occupation as a physician and, therefore, he was not totally disabled under the terms of the disability insurance policies. Because Knott was not totally disabled under the terms of the policy, Provident did not breach its insurance contract with Knott by paying him policy benefits for two years but denying lifetime benefits for total disability. Accordingly, it is not necessary to address the other defenses to Knott's breach of contract claim raised in the motions for summary judgment. Further, Provident and Gatlin established that Knott's extra-contractual claims were barred by the applicable two-year statutes of limitations. Therefore, we conclude that the trial court's summary judgment in favor of Provident and Gatlin was proper. Accordingly, we reverse the court of appeals' judgment regarding Knott's breach of contract claim, affirm the court of appeals' judgment regarding the remaining extra-contractual claims, and render judgment that Knott take nothing.