# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00435-CV

**Charles Ly, Appellant**

**v.**

**Rodney Schmidt, M.D., Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. D-1-GN-06-001242, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Charles Ly appeals from the district court's grant of summary judgment in favor of Rodney Schmidt, M.D. Ly asserts that the evidence presents fact issues regarding standard of care and causation. We affirm the judgment.

## BACKGROUND

On June 1, 2001, Ly sued Seton Medical Center, Albert Horn, M.D., Sam S. Roberts, M.D., Sara Austin, M.D., Kent Ellington, M.D., and Rodney Schmidt, M.D., alleging negligence "during the course of medical treatment provided by the above named Defendants . . . beginning on or about March 8, 1999 through March 14, 1999" after Ly suffered a stroke. Dr. Schmidt is a board-certified neuroradiologist who interpreted a CT scan of Ly's head taken on March 8. Ly alleged that Dr. Schmidt misinterpreted the results of this scan and/or failed to properly communicate his interpretation of the scan to Ly's emergency room physicians. Ly contended that Dr. Schmidt's acts

or omissions resulted in the administration of anti-coagulation medicine that Ly alleges caused him to suffer a brain hemorrhage on March 14, 1999.

On October 3, 2005, Dr. Schmidt filed a motion for summary judgment under rule 166a(c), alleging that the evidence conclusively establishes that Dr. Schmidt did not breach the applicable standard of care in his interpretation of or communications regarding Ly's CT scan and that any alleged breach of the standard of care was not a proximate cause of Ly's injuries. On January 19, 2006, the district court granted Dr. Schmidt summary judgment without specifying the grounds[1] and subsequently overruled a motion for rehearing. The court later severed out Ly's claims against Dr. Schmidt, making the judgment final. Ly appeals from this summary judgment.[2]

---

[1] The district court initially granted Dr. Schmidt's summary judgment motion on January 16. At the time, Ly, who was acting pro se, had not filed a response, although Dr. Schmidt's motion had been pending since October. The record also reflects that the district court had previously denied Ly's motion for continuance of the summary judgment hearing and that Ly had obtained several prior postponements of dispositive proceedings in the litigation due in part to his difficulties in retaining counsel. Following the district court's summary judgment order, Dr. Schmidt's counsel received a copy of Ly's summary-judgment response and motion for extension of time, and furnished a copy to the district court. On January 19, the district court signed a first amended order granting Dr. Schmidt's summary judgment motion in which it acknowledged having considered Ly's response and motion for extension of time.

[2] This is Ly's third appeal arising from this litigation. *See Ly v. Austin*, No. 03-05-00516-CV, 2007 Tex. App. LEXIS 5475 (Tex. App.—Austin July 13, 2007, no pet. h.) (mem. op.) (affirming district court's dismissal of Ly's claims against defendants Austin and Ellington); *Ly v. Seton Medical Center*, No. 03-05-00515-CV (Tex. App.—Austin Mar. 8, 2007) (granting joint motion to dismiss appeal pursuant to settlement agreement).

## DISCUSSION

### Standard of review

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 291 n.4 (Tex. 2004) (citing *Knott*, 128 S.W.3d at 215-16). A movant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). Because the district court's order does not specify the grounds for its summary judgment, we must affirm the summary judgment if any of the theories presented to the district court are meritorious. *Knott*, 128 S.W.3d at 216.

### Summary judgment grounds

To establish negligence in a medical malpractice case, a plaintiff must show (1) a legal duty, (2) a breach of that duty, and (3) damages proximately caused by the breach. *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2003); *Columbia Med. Ctr. Subsidiary, L.P. v. Meier*, 198 S.W.3d 408, 414 (Tex. App.—Dallas 2006, pet. denied). In his motion for summary judgment, Dr. Schmidt contended that the evidence conclusively established that he did not breach

the applicable standard of care and that, even if he did, such breach was not the proximate cause of Ly's hemorrhage. We agree with the district court that Dr. Schmidt is entitled to summary judgment as to both elements.

### Standard of care

The threshold question in a medical malpractice case is the standard of care. *Jones v. Miller*, 966 S.W.2d 851, 854 (Tex. App.—Houston [1st Dist.] 1998, no pet.). In determining that standard, the court must be guided solely by expert opinion. *Armbruster v. Memorial Sw. Hosp.*, 857 S.W.2d 938, 941 (Tex. App.—Houston [1st Dist.] 1993, no writ). A summary judgment may be based on the uncontroverted affidavit of an interested witness if the testimony is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and capable of being readily controverted. Tex. R. Civ. P. 166a(c); *Trico Techs. Corp. v. Montiel*, 949 S.W.2d 308, 310 (Tex. 1997); *Republic Nat'l Leasing Corp. v. Schindler*, 717 S.W.2d 606, 607 (Tex. 1986); *First Nat'l Bank v. Lubbock Feeders, L.P.*, 183 S.W.3d 875, 881 (Tex. App.—Eastland 2006, pet. denied).

In Dr. Schmidt's affidavit, which he attached as evidence to his motion for summary judgment, Dr. Schmidt explained the standard of care applicable to a neuroradiologist interpreting CT studies of the head:

> Specifically, in reviewing a head CT scan such as that performed upon Charles Ly on March 8, 1999, the standard of care required a neuroradiologist to evaluate the entire film study for imaging abnormalities which may represent a possible cerebral vascular accident (i.e. stroke), and to timely report such findings to the patient's treating physician. . . . The standard of care also requires the neuroradiologist to evaluate the entire film study for any signs of acute or ongoing hemorrhages or bleeds in the patient's brain, and to timely report such findings to the patient's treating physician.

4

In diagnosing a potential hemorrhage, the standard of care requires a neuroradiologist to differentiate a potential hemorrhage in the patient's brain from other benign findings such as dystrophic calcification which also shows up as a high brain density or white area on the head CT scan.

To summarize, Dr. Schmidt averred that the standard of care requires a neuroradiologist to evaluate the entire CT scan, identify and investigate imaging abnormalities which might represent a stroke or hemorrhage, and timely communicate any relevant findings to the patient's treating physicians. Ly does not dispute that this is the applicable standard of care for neuroradiologists.

Dr. Schmidt's affidavit shows that he followed this standard of care. Dr. Schmidt stated that he examined the entire film, noted on his report the "absence of edema, mass effect, or sulcal effacement," and focused the computer onto an area of high density, performing measurements on that critical area. Dr. Schmidt concluded:

Based upon my review of the entire March 8, 1999 head CT film series . . . I made a determination and timely communicated to the emergency room physicians the following: "[s]ome high density in the basal ganglia favors dystrophic type calcification over petechial hemorrhage." It is thus my expert opinion that my review and interpretation of Charles Ly's head CT scan from March 8, 1999 met all applicable standards of care, and that I was not negligent in my care of Charles Ly.

It is this interpretation, "favor[ing] dystrophic type calcification over petechial hemorrhage," that serves as the basis of Ly's complaint against Dr. Schmidt. Ly asserts that the results of the scan actually favored a hemorrhage, and that if Dr. Schmidt had properly interpreted and/or communicated the results to Ly's treating physicians, they would not have prescribed Ly the anti-coagulation medication that Ly alleges caused him to suffer a hemorrhage.

5

However, Dr. Schmidt provided summary judgment evidence conclusively establishing that his interpretation was proper. During his deposition, Dr. Albert Horn, M.D., a board-certified neurologist who was also a defendant in the original action, was asked if he believed that the area of high density favored calcification over hemorrhage. Dr. Horn testified that he was "absolutely 100 percent certain" that it did. Furthermore, Dr. Sara Austin, M.D., another board-certified neurologist and also a defendant, testified during her deposition that the area of high density identified by Dr. Schmidt was consistent with what she had visualized in Ly's previous radiological films.[3] Dr. Austin also testified that she agreed that the area of high density was not an acute hemorrhage and "would have had to have been there for at least two more years."

Additionally, Ly's own neuroradiological expert, Dr. Philip Shalen, M.D., testified during his deposition that although he disagreed with Dr. Schmidt's interpretation of the CT scan, he thought that Dr. Schmidt's interpretation was reasonable and satisfied the applicable standard of care:

Q:     Do you disagree with the interpretation that Dr. Schmidt made in that March 8, 1999 CT scan?

A:     Yes.[4]

---

[3] As will be discussed in more detail below in our discussion of proximate cause, Ly was treated for a brain injury at Brackenridge Hospital in January 1997. The previous films were related to the 1997 injury.

[4] In his deposition, Dr. Shalen originally said, "No." However, he amended his deposition to reflect that he did disagree with Dr. Schmidt's interpretation. Dr. Shalen made other amendments to his deposition, none of which are relevant to this appeal. There is some dispute about whether Dr. Shalen's amended deposition answers were admissible. We need not resolve that dispute, because even if the amended answers were admissible, they do not change Dr. Shalen's ultimate conclusion that, even though he disagreed with Dr. Schmidt's interpretation of the CT scan, he thought that Dr. Schmidt's interpretation was reasonable and met the standard of care.

6

Q:    Okay. Do you think his interpretation was reasonable and met the standard of care?

A:    Yes.

Q:    And that's for a neuroradiologist practicing in Austin, Texas in 1999; would that be correct?

A:    Yes.

. . . .

Q:    Let me back up to a few things you've said. One is you said there's more on these images than he's put in the report.

A:    Correct.

Q:    But you do not feel that it was a breach of the standard of care, correct?

A:    No, because people disagree as to what's on a scan.

. . . .

Q:    My question to you, though, is are you going to say at the time of trial or at the time of the hearing in this case that it was a breach of the standard of care for Dr. Schmidt to have not included additional information that you feel exists on those images in the report?

A:    I don't think it's the breach of the standards of care [sic].

Ly further asserts that even if Dr. Schmidt's interpretation of the scan did not breach the standard of care, Dr. Schmidt's failure to communicate the possibility of a hemorrhage to Ly's treating physicians did. However, Dr. Schmidt provided summary judgment evidence that he communicated that possibility to the emergency room doctors. Again, Ly's own expert, Dr. Shalen, provided testimony that actually supports Dr. Schmidt's position:

7

A: My only issue with this case is the reporting of the possibility that hemorrhage might exist.

Q: And you agree that was reported in the dictated report?

A: It was in the dictated report.

Q: And if normal practice had been followed - or strike that. You don't have any evidence to contradict Dr. Schmidt's testimony that that's also what he would have communicated to the emergency room doctor?

A: No, I don't have any evidence that, you know, he wouldn't communicate the same thing that he typed.

Q: That's - that's normally the way it goes?

A: That's normally the way we do it.

Dr. Shalen further testified that oral communication of the findings was important:

Q: . . . [Y]ou've testified earlier you feel the standard would have been met if Dr. Schmidt had reported the findings on his radiology report to the emergency room physician?

A: Right. And I'd - if you'd allow me. You know, I put that in writing and said if a determined attempt was made by the neuroradiologist to orally communicate the CT findings, then no breach in the standard of medical care occurred.

Q: And do you still agree with that?

A: I still agree with that.

Dr . Shalen concluded that if Dr. Schmidt made a telephone call and communicated with the ER doctor, there would be no breach:

8

Q: Okay. But we can agree, can we not, that what's important is that the call was made?

A: It is important that the call was made.

Q: Well, that - No. That's everything because if Dr. Schmidt made that call and spoke to an ER doctor, then you've told me he has met his standard of care.

A: If Dr. Schmidt made the call and spoke to the ER doctor, then he's, you know, he's done the right thing as far as I'm concerned.

The evidence further established that Dr. Schmidt indeed made that call and spoke to an emergency room physician. In his affidavit, Dr. Schmidt testified:

Following my interpretation of Charles Ly's head CT scan on March 8, 1999, and prior to dictating my report herein, I made a contemporaneous telephone call to the emergency room to discuss the pertinent findings on Charles Ly's head CT scan. In reference to Charles Ly's March 8, 1999 head CT scan, I communicated the pertinent findings to either Dr. Roberts or another emergency room physician. Specifically, my communications to such physician included all pertinent portions of my dictated report including, but not limited to the following: (a) I communicated my differential diagnosis favoring dystrophic calcification over hemorrhage; (b) I communicated the fact I could not absolutely rule out a hemorrhage in Charles Ly; and (c) I recommended further MRI imaging to follow up on this patient.

Dr. Shalen's testimony confirms that Dr. Schmidt made the call:

Q: The report specifically says "Preliminary results of this study were telephoned to the ER upon its completion contemporaneously," correct?

A: That's what it says.

. . . .

Q: Okay. Can you point to any evidence in this case that indicates the statement "Preliminary results of this study were telephoned to the ER" was incorrect?

A: No.

9

Ly provided no competent summary judgment evidence to controvert the above evidence establishing that Dr. Schmidt satisfied the applicable standard of care. Ly attached to his response to the motion for summary judgment Dr. Shalen's affidavit. The affidavit identifies the applicable standard of care for a neuroradiologist, but it does not state that the standard of care was breached. Dr. Shalen states that "there is no indication in the ER notes that either doctors Roberts or Austin were aware that the CT findings included the possibility of hemorrhage," but this is not evidence of Dr. Schmidt's negligence. In fact, Dr. Shalen does not even refer to Dr. Schmidt in the affidavit.

Ly also attached to his response to the motion for summary judgment (and to his appellate brief) copies of his CT scans and medical articles, essentially asking the district court and now this Court to independently determine that Dr. Schmidt's interpretation of the results of the CT scan was incorrect. However, we are judges, not doctors, and we cannot make such a determination in the absence of expert testimony. *See Williams v. Huber*, 964 S.W.2d 84, 86 (Tex. App.—Houston [14th Dist.] 1997, no pet.) ("In a medical malpractice case, both the establishment and preclusion of summary judgment are dependent upon expert testimony.").

Ly also attached to his response an affidavit by Ralph Lilly, M.D., a board-certified neurologist.[5] However, rule 166a requires affidavits to conform to section 312.011(1) of the government code. *Hall v. Rutherford*, 911 S.W.2d 422, 425 (Tex. App.—San Antonio 1995, writ denied). Section 312.011(1) defines an affidavit as "a statement in writing of a fact or facts

---

[5] Prior to the summary judgment hearing, Dr. Schmidt objected to the qualifications of Dr. Lilly. The district court sustained Dr. Schmidt's objection and excluded any testimony by Dr. Lilly regarding the standard of care.

signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by the officer under his seal of office." Tex. Gov't Code Ann. § 312.011(1) (West 2005). Dr. Lilly's affidavit is unsworn. Thus, it is not proper summary judgment evidence and is not to be considered. *See Bernsen v. Live Oak Ins. Agency, Inc.*, 52 S.W.3d 306, 310 (Tex. App.—Corpus Christi 2001, no pet.) (holding that "an unsworn statement that purports to be an affidavit" will not support summary judgment); *Coastal Cement Sand v. First Interstate Credit Alliance*, 956 S.W.2d 562, 567 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) ("Without the notarization or jurat, the unsworn statement is not an affidavit, and it is not proper summary judgment evidence.").[6]

In the absence of any controverting evidence, we hold that Dr. Schmidt's evidence conclusively establishes that he did not breach the applicable standard of care. Accordingly, Dr. Schmidt was entitled to summary judgment on that ground.

### Proximate cause

The evidence also conclusively establishes that Dr. Schmidt's actions were not the proximate cause of Ly's injury. The two elements of proximate cause are cause in fact and

---

[6] We also note that in his brief, Ly for the first time makes allegations concerning a conversation between his daughter and Dr. Roberts, one of the emergency room physicians. We will not consider these allegations as they were not raised in the trial court and the alleged conversation is not competent summary judgment evidence. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 676 (Tex. 1979); *Four Bros. Boat Works v. S & SF, Inc.*, 55 S.W.3d 12, 17-18 (Tex. App.—Houston [1st Dist.] 2001, pet. denied); *see also* Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."). Additionally, any statements made by Dr. Roberts to Ly's daughter are inadmissible hearsay. *See* Tex. R. Evid. 802.

11

foreseeability. *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 798. These elements cannot be satisfied by mere conjecture, guess, or speculation. *Id*. at 799. Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred. *Id*. In a medical malpractice case, plaintiffs are required to show evidence of a "reasonable medical probability" or "reasonable probability" that their injuries were proximately caused by the negligence of one or more defendants. *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995).

Furthermore, "[t]o raise a fact issue on causation . . . . if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty." *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997); *see Lette v. Baptist Health Sys.*, 82 S.W.3d 600, 601-02 (Tex. App.—San Antonio 2002, no pet.); *Gillie v. Boulas*, 65 S.W.3d 219, 224 (Tex. App.—Dallas 2001, pet. denied). In other words, if Schmidt's evidence established that there were other plausible causes of Ly's brain hemorrhage, or that Ly was simply "one of the unlucky patients" who was going to suffer a hemorrhage no matter what his treating physicians did, in order to survive summary judgment, Ly needed to offer controverting evidence that excluded with reasonable certainty Dr. Schmidt's alternative theories of causation. *See Helm v. Swan*, 61 S.W.3d 493, 497-98 (Tex. App.—San Antonio 2001, pet. denied).

Ly alleges that he suffered a brain hemorrhage because his treating physicians administered anti-coagulation medicine to him based on Dr. Schmidt's interpretation of Ly's CT scan. However, Dr. Schmidt produced summary judgment evidence establishing that the hemorrhage

12

could have occurred whether or not Ly was prescribed anti-coagulation medicine. The defendants deposed Ly's neurology expert, Michael Katz, M.D. In his deposition, Dr. Katz testified as follows:

Q:     An ischemic stroke can transform into a hemorrhagic process, can it not?

A:     A very well-known phenomena [sic].

Q:     And typically it transforms into that and bleeds into generally the area that there were ischemic problems originally. Right, sir?

A:     Not all the time, but in general that's true.

. . . .

Q:     We already established a person with an ischemic stroke can develop a hemorrhage or hemorrhagic component to that stroke. Is that right, sir?

A:     That is correct.

Q:     And that can happen whether or not a patient is on anticoagulants. Right, sir?

A:     Yes, that is true.


The defendants also obtained similar testimony from Dr. Shalen:


Q:     In other words, a patient can come in and have an ischemic infarct [a stroke] and can have studies, a CT study done which shows no evidence of hemorrhage or anything else that would contraindicate the giving of Heparin; Heparin can be given to the patient appropriately under those circumstances, but the patient can have this hemorrhagic transformation where the blood brain barrier breaks down over time and you end up with a bleed four, five, six days later, correct?

A:     Okay.

Q:     Do you agree or not?

A:     Yes.

Q: Okay. And there is just an unfortunate set of patients that, regardless of what the physicians do, that this hemorrhagic transformation is going to occur; would you agree with that?

A: I'd agree.

Q: And Heparin can be given or Heparin cannot be given, but the hemorrhagic transformation can still happen?

A: Correct.

Q: And would you agree with me that in this case, based on the evidence that we have and everything we know about it today, that Mr. Ly could have been one of those unfortunate individuals that even if he had ischemic infarct beginning or even if he had hemorrhagic infarct at the beginning, that this hemorrhagic transformation could have occurred and he would have had the same injury he had on the 14th, regardless of what the doctors did?

A: It's possible.

Q: In other words, everything could have been done by the book as - under your opinion in this case when Mr. Ly came in, and Heparin would have been withheld or MRI studies would have been done, and on the basis of those Heparin would have been withheld and the result still could have been the same?

A: It's possible.

Q: Yes, sir. And there's no way for you to rule that out sitting here today, is there?

A: No.

Ly offered no summary judgment evidence controverting this testimony. Thus, this evidence conclusively establishes that Ly's injury plausibly could have occurred regardless of whether or not he was prescribed anti-coagulation medicine as a result of Dr. Schmidt's interpretation of Ly's CT scan.

14

Additionally, Dr. Schmidt offered summary judgment evidence indicating that even if the anti-coagulation medicine was the cause of Ly's hemorrhage, one of Ly's treating physicians would have prescribed the medicine regardless of what information Dr. Schmidt may have communicated about the results of the CT scan. The neurologist who ordered the anti-coagulation therapy was board-certified neurologist Dr. Sara Austin, M.D., another one of the doctors whom Ly sued. Dr. Austin was also deposed and testified that it was her standard practice to *independently* review the results of a patient's CT scan prior to ordering anti-coagulation therapy:

Q:      Okay. What was the routine practice back in March or so of 1999 . . . . for communicating the information and results of a CT scan?

A:      You know, often when the emergency room doctor would call me to admit a patient, they would say, you know, we have a patient with a stroke. The CT scan shows this; you know would you come see him. That was part of it. But my routine practice is to go find the scan and look at it, and I do that 90 or 95 percent of the time, look at the scan. Almost always. . . .

Q:      So, if I understand you, in terms of getting a communication from the neuroradiologist, you rarely talked directly to the neuroradiologist?

A:      Yeah.

. . . .

Q:      All right. And so take it one step further than that. . . . Is it your standard practice 90 to 95 percent of the time to personally review a patient's head CT scans before you would prescribe Heparin for that patient?

A:      Yes.

Q:      And do you have any reason to believe that you deviated from your standard practice in Mr. Ly's case on March 8, 1999?

A:      No.

15

Q: Okay. And kind of as a background, are you qualified to review head CT scans? Is that something you've had training and experience doing?

A: Yes.

Dr. Austin went on to testify that although it was her standard practice to do so, she could not recall if she had examined Dr. Schmidt's report prior to ordering the anti-coagulation therapy. After reviewing the report during the deposition, Dr. Austin acknowledged that Dr. Schmidt had recommended follow-up MRI studies. Dr. Austin further testified that she would have ordered anti-coagulation therapy regardless of Dr. Schmidt's recommendation regarding an MRI:

Q: Okay. So do you understand this [Dr. Schmidt's report] to suggest that an MRI would be helpful?

A: Dr. Schmidt thinks it would be helpful, yes.

. . . .

Q: Going back to the MRI, the recommendation or the suggestion, I suppose, of an MRI in Dr. Schmidt's dictation on Page 70 of these Seton records, if you had known that Dr. Schmidt suggested an MRI, would that have changed at all your decision to go forward with Heparin therapy?

A: No.

Assuming that the anti-coagulation therapy was the cause of Ly's hemorrhage, the above testimony, which was uncontroverted, establishes that Dr. Austin's independent decision to order anti-coagulation therapy was a superseding cause of Ly's injury. *See Phan Son Van v. Pena*, 990 S.W.2d 751, 754 (Tex. 1999) (listing factors that are to be considered in determining whether

16

intervening force rises to level of superseding cause, including "the fact that the intervening force is operating independently of any situation created by the actor's negligence").

Finally, Dr. Schmidt provided summary judgment evidence indicating that, in his expert opinion, the hemorrhage that Ly suffered was not related to and/or proximately caused by the stroke for which Ly was treated. Instead, the hemorrhage may have been the result of a brain injury suffered two years prior to Ly's stroke. In his affidavit, Dr. Schmidt averred:

> In reviewing the head CT scan of Charles Ly dated March 8, 1999, a crescent-shaped area of high density was identified in the putamen of the basal ganglia. . . .
>
> Since the beginning of this litigation, I have had the opportunity to review several previous radiological studies performed upon Charles Ly. Specifically, I have reviewed the films and report of a head CT scan performed upon Charles Ly at Brackenridge Hospital on January 5, 1997. The report from this study indicated "[a] streak of increased attenuation is seen along the right lateral margin of the basal ganglia that could be parenchymal hemorrhage from a shearing type injury. A thick streak of calcium could also produce this appearance." This "streak" of increased density brain matter reported in January 1997 is located in the exact same portion of the brain in which the high density area was noted on Charles Ly's March 8, 1999 head CT scan.
>
> . . . .
>
> Based upon the age of the crescent-shaped high density area of calcification, as well as its far-removed location in the putamen of the patient's basal ganglia, it is my expert opinion that Charles Ly's hemorrhage in the right front intraparenchymal region of his brain on March 14, 1999 was not related to and / or not proximately caused by the aforementioned crescent-shaped high density area of calcification. Specifically, the high density area in the patient's basal ganglia was still present and not contiguous to the area of hemorrhage on March 14, 1999. This would lead me to conclude the crescent-shaped area of high density was not indeed a hemorrhage, and was not a proximate cause of Charles Ly's eventual hemorrhage on March 14, 1999.

This evidence establishes a plausible alternative cause of Ly's hemorrhage, and although Ly disputed some of the conclusions in Dr. Schmidt's affidavit, Ly did not provide any summary judgment evidence controverting this alternative theory of causation.[7]

For these reasons, we hold that the summary judgment evidence conclusively negates the essential element of proximate cause. Therefore, Dr. Schmidt was also entitled to summary judgment on that ground.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:  August 28, 2007

---

[7] In fact, the only evidence concerning proximate cause that Ly provided in his response to Dr. Schmidt's motion for summary judgment was the statement of Dr. Ralph Lilly, who concluded that "the initial and continued application of [the anti-coagulation medicine] caused the extension of a pre-existing hemorrhagic infarct." However, as we discussed earlier, Dr. Lilly's affidavit is unsworn and is not competent summary judgment evidence. *See Coastal Cement Sand v. First Interstate Credit Alliance*, 956 S.W.2d 562, 567 (Tex. App.—Houston [14th Dist.] 1997, pet. denied).

18