# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 23, 2010

Lyle W. Cayce
Clerk

No. 08-50370

ROBERT NEWHOUSE, Chapter 7 Trustee of the Mainland Drilling LP;
DALLAS DRILLING INC,

Plaintiffs - Appellants

v.

COLONY INSURANCE COMPANY,

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:07-CV-16

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

PER CURIAM:[*]

This is an appeal from the district court's order holding that
Defendant/Appellee Colony Insurance Co. ("Colony") had no duty to defend
Plaintiffs/Appellants Mainland Drilling LP et al. ("Mainland") under its
insurance policy from claims brought by state-court plaintiff Chaparral Energy
L.L.C. ("Chaparral").  The district court held that Chaparral's claims fell under

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 08-50370

an exclusion to the insurance policy that barred claims from a "co-owner of the working interest."  Finding no error, we AFFIRM.

1.    Mainland first argues that the district court's reading of the "co-owner of the working interest" exclusion would render coverage illusory for five hazards outlined in the policy, because such hazards are those typically faced by an owner of a mineral lease.  However, the district court's reading of the exclusion does not bar claims from all owners of a working interest in a mineral lease, just one who either (a) "[p]articipates in the operating expense of such properties" or (b) "[h]as the right to participate in the control development or operations of such properties," as the term "co-owner of the working interest" is exclusively defined in the policy. Further, even if coverage for some of these hazards might not apply to an owner of a working interest in a mineral lease in some contexts, coverage for all of these hazards certainly could apply to a third party such as the owner of an adjacent property.  Because there remain circumstances under which Colony remains obligated to provide coverage for the hazards outlined in the policy against other classes of claimants, coverage has not been rendered illusory. *Accord ATOFINA Petrochems., Inc. v. Cont'l Cas. Co.*, 185 S.W.3d 440, 444 (Tex. 2005) (noting that defendant's "interpretation that the exclusion bars *all* coverage when *any* negligence on the part of the premises owner is pleaded, unless the owner's responsibility is based *solely* on vicarious liability for the acts of the contractor, would render coverage under the endorsement largely illusory") (emphasis added).

2.    Mainland next argues that the district court erred in finding that Chaparral was a "co-owner of the working interest" because Chaparral's pleadings demonstrate that Chaparral neither (a) participated in the operating expenses of the mineral lease nor (b) retained the right to

2

No. 08-50370

participate in the control and development or operations of the lease. Mainland is incorrect on both counts. Looking to the Daywork Agreement between Mainland and Chaparral (which Chaparral expressly incorporated into its petition), we see that the parties contracted for Chaparral to provide dozens of tools and services for the oil-drilling operation. Chaparral's petition further alleges that Chaparral furnished various materials throughout the operation when Mainland failed to do so. In addition, the Daywork Agreement specifically reserved to Chaparral the right of direction and control over the entire operation. Whether Chaparral ever chose to exercise that right is irrelevant for purposes of the insurance policy. Therefore, the district court did not err in holding that Chaparral met both disjunctive prongs of the term "co-owner of the working interest."

3.   Mainland also argues that Chaparral claimed damages both before and after the Daywork Agreement was in effect, thus taking some matters of coverage outside the policy exclusion. This argument is wholly without merit. Any damages claimed before the Daywork Agreement was in effect were also before the insurance policy was in effect, and were therefore necessarily excluded from coverage. The Chaparral petition also demonstrates that all damages to Chaparral stem directly from Mainland's alleged failure to perform its duties under the Daywork Agreement, under which Chaparral was a "co-owner of the working interest."

4.   Finally, Mainland argues that even if Chaparral satisfies the definitional prongs of the term "co-owner of the working interest" as it appears in the policy, Chaparral does not satisfy the general meaning of the term. Specifically, Mainland argues that it owns no working interest in the well, and therefore Chaparral does not "co-own" anything with Mainland. The

3

No. 08-50370

mineral ownership of Mainland is irrelevant to the policy definition of "co-owner."    Moreover, the term "co-owner of the working interest" is specifically defined in the policy, and Chaparral satisfies both prongs of that definition.   Inasmuch as there exists a tension between the policy's definition and any other definition, the definition in the policy controls. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 219 (Tex. 2003) ("When terms are defined in an insurance policy, those definitions control the interpretation of the policy.").

AFFIRMED.

No. 08-50370

PRISCILLA R. OWEN, Circuit Judge, dissenting.

I respectfully dissent. The commercial general liability policy presently before us contains provisions that seem to conflict, and it is ambiguous regarding coverage of the claims made against Mainland Drilling Limited Partnership, the insured, in the underlying litigation. I would therefore reverse and remand. Despite the majority opinion's protestations, that opinion's interpretation of the policy does indeed "render coverage under the endorsement largely illusory."[1]

## I

The policy at issue, including the endorsement in particular, is not a model of clarity. The endorsement provides that it modifies the insurance provided in preceding sections of the policy. The endorsement then sets forth an exclusion and an exception to the exclusion:

A.   SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions is amended and the following added:

This insurance does not apply to:

Oil and Gas Working Interests

(1)   "Property damage":

(a)   claimed by you or any "co-owner of the working interest";

(b)   incurred by or at the request of you, additional insureds or any "co-owner of the working interest";

(c)   claimed by any co-worker or additional insured of "co-owners of the working interest"; or

---

[1] *ATOFINA Petrochems., Inc. v. Cont'l Cas. Co.*, 185 S.W.3d 440, 444 (Tex. 2005).

5

No. 08-50370

> (d)    from the blowout or cratering of a well resulting from or in connection with operations performed by you or on your behalf unless you at your own cost and expense, promptly and diligently take whatever steps are necessary or legally required of you or necessary for you or any other person to bring such well under control.

The term "co-owner of the working interest" is defined in the endorsement:

> "Co-owner of the working interest" means any person or organization who:
>
> > a.    participates in the operating expense of such properties; or
> >
> > b.    has the right to participate in the control, development or operations of such properties.

Immediately following the section in the endorsement containing the exclusion of property damage claimed by "any 'co-owner of the working interest'", the endorsement amends the policy limits but also appears to identify coverage for five hazards ((a) through (e) below):

> B.    SECTION III – LIMITS OF INSURANCE is amended and the following added:
>
> > Subject to 5. above, the most we will pay under Coverage A for "property damage" resulting from or caused by "your work" or "your product" included within the "products completed operations hazard" as described in the Declarations and included within one or more of the following:
> >
> > > a.    "Blowout and cratering hazards",
> > > b.    "Explosion hazard",
> > > c.    "Collapse hazard",
> > > d.    "Saline substance contamination hazard", or

6

No. 08-50370

e.    "Underground resources and equipment hazards"

is:

$250,000 Each Occurrence
$250,000 Aggregate

Each of the foregoing hazards is extensively defined in the endorsement.[2]

_____

[2] The endorsement provides:

C.    SECTION V - DEFINITIONS is amended and the following added:

1.    "Blowout and cratering hazards" means "property damage" above the surface of the earth caused by or resulting from:
      a.    an uncontrolled eruption of gas and/or oil from a well; and
      b.    the resulting collapse or caving in of the surrounding earth or structure around a well.
2.    "Collapse hazard" includes "structural property damage" and any resulting "property damage" to any other property at any time.
                    . . .
4.    "Explosion hazard" includes "property damage" arising out of blasting or explosion. The "explosion hazard" does not include "property damage" arising out of the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment.
5.    "Saline substance contamination hazard" includes "property damage" resulting from or caused by the contamination of oil, gas, water, mineral substances or other property by a saline substance.
6.    "Structural property damage" means the collapse of or structural injury to any building or structure due to:
      a.    grading of land, excavating, borrowing, filling, back-filling, tunneling, pile driving, cofferdam work or caisson work; or
      b.    moving, shoring, underpinning, raising or demolition of any building or structure or removal or rebuilding of any structural support of that building or structure.
7.    "Underground resources and equipment hazards" includes "property damage" to any of the following:
      a.    oil, gas, water or other mineral substances which have not been reduced to physical possession above the surface of the earth or above the surface of any body of water;
      b.    any well, hole, formation, strata, or area in or through which exploration for or production of any substance is carried on;

7

No. 08-50370

The majority opinion concludes that Mainland has coverage for claims made against it by a working interest owner for property damage resulting from all of the hazards identified in the definitions above. However, this coverage is extremely limited in the view of the majority opinion. Coverage is available only when the working interest owner whose property is damaged does not participate in the expenses of operating its working interest and has no right to participate in operations.[3]

The majority opinion recognizes that its interpretation of the endorsement results in sparse coverage. The opinion nevertheless concludes that its construction is the only reasonable one, asserting that the endorsement provides coverage in at least two circumstances. One is when a working interest owner "does not participate in the operating expense of such properties" or does not have the right to participate in the control or operations of such properties.[4] With great respect, it would be highly unusual for a working interest owner to not participate, at all, in the operating expenses of an oil and gas working interest that is being drilled or developed or to not have *the right* to participate.[5]

---

c.     any casing, pipe, bit, tool, pump, or other drilling or well servicing machinery or equipment located beneath the surface of the earth in any such well or hole or beneath the surface of any body of water.

[3] *Ante*, at ¶ 1.

[4] *Id.*

[5] A working interest is "[t]he operating interest under an oil and gas lease. The owner of the working interest has the exclusive right to exploit the minerals on the land." 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW, MANUAL OF TERMS 1191 (2000); *see also Broesche v. Jacobson*, 218 S.W.3d 267, 272 n.3 (Tex. App.–Houston [14th Dist.] 2007, pet. denied) (citing Williams & Meyers's treatise for its definition of working interest and noting that "[c]ourts in Texas and around the country have relied on this treatise when analyzing the meaning of a working interest in particular cases"). "Under an oil and gas lease, operating expenses are the burden of the working interest in the property and a royalty interest is free of the burden of such expenses." 8 WILLIAMS & MEYERS, *supra*, at 730; *see also Johnston v. Am. Cometra, Inc.*, 837 S.W.2d 711, 717 (Tex. App.–Austin 1992, writ denied) (holding that the

8

No. 08-50370

I submit that such a circumstance would be extremely rare, if not non-existent. Of course, there may be instances in which a working interest owner opts out of participation in the drilling or re-working of a particular well under a joint operating agreement that permits that option. But even under those

---

"appellants [were] the parties whom the take-or-pay obligation [was] intended to compensate" because the "appellants [were] working-interest owners who, unlike lessors, share the risk and expense of exploration, production and development").

"When a leasehold is concurrently owned, normally the concurrent owners, before beginning exploration and development of the premises, enter into an operating agreement specifying the rights and liabilities of the parties and designating an operator. Such agreements typically provide for contribution by nonoperators to expenses incurred and that the operator will, from time to time, bill the nonoperating concurrent owners for their share of the costs." 2 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW § 503.2. Typical provisions of a joint operating agreement include "requiring the operator to discharge all costs and expenses incurred and the nonoperators to contribute proportionately to such costs and expenses as billed to them by the operator." *Id.* "If the operating agreement does not include an express promise by the nonoperators to contribute to the expenses of acquisition, exploration, development and operation of the premises, the operator usually is not entitled to reimbursement from the nonoperating concurrent owner except out of the proceeds of exploration, development and operation." *Id.*

The term "joint exploration activities" is

> used to describe the situation of a jointly owned lease or block of acreage which contemplates the exploration and drilling of multiple wells, each party paying for its own costs and being entitled to its pro rata share of income and operating expenses.
> This joint form of oil and gas activity is primarily conducted via the form of a "joint operating agreement" in which the various participants appoint an operator who controls the day-to-day operations and has authority to make decisions affecting the other interest owners in nonmajor areas of operations.

8 WILLIAMS & MEYERS, *supra*, at 540 (internal quotation marks omitted). A "joint operating agreement" is

> [a]n agreement between or among interested parties for the operation of a tract or leasehold for oil, gas and other minerals. This type of agreement is frequently entered into before there has been any development. Typically the agreement provides for the development of the premises by one of the parties for the joint account. The parties to the agreement share in the expenses of the operations and in the proceeds of development, but the agreement normally is not intended to affect the ownership of the minerals or the rights to produce, in which respects, among others, the joint operating agreement is to be distinguished from a unitization agreement and from a mining partnership.

*Id.* at 541.

circumstances, the working interest owner who is given the right to opt out has the *right* to participate.

The other circumstance in which the majority opinion asserts that the endorsement at issue could apply is "to a third party such as the owner of an adjacent property."[6]   In such a situation, the majority opinion concludes, "coverage for all of these hazards [the five listed in the endorsement] certainly could apply."[7]  The opinion does not explain whether damage sustained by the third-party working interest owner of the adjacent property would be covered if that owner participated in the expense of operating its working interest or had the right to participate in those operations.  But it seems inescapable that the majority opinion's definition of "co-owner of the working interest" must be the same under this endorsement, regardless of whether the working interest that is damaged is one that is the subject of a drilling contract with Mainland or instead is a working interest in an adjoining property damaged by Mainland's operations. The fact remains that the coverage that Colony Insurance Company now asserts that it provided, and extensively defined, is virtually meaningless, if the majority opinion's construction of the endorsement were correct.

For example, if Mainland's negligence allegedly causes damage to a well and casing on an adjoining property,  Mainland has no coverage for, and therefore no right to a defense against, claims made by a working interest owner in that adjoining property who bears some or all of the cost of exploring and developing the working interest.  But Mainland would have coverage and a right to a defense, the majority opinion opines, if, in the unlikely event, Mainland is sued by a working interest owner in the adjoining property who has no right to participate in operations and in fact did not participate.

---

[6] *Ante*, at ¶ 1.

[7] *Id.*

No. 08-50370

I respectfully submit that the majority opinion's interpretation of the endorsement not only provides Mainland with an exceedingly odd extension of insurance coverage, the interpretation is an unreasonable one.

## II

Even assuming that the majority's interpretation were reasonable, another reasonable interpretation of the policy that Colony Insurance Company issued exists. That is that the exclusion in the endorsement regarding co-owners of a working interest applies only when Mainland is performing work on property in which *it* or an additional insured owns a working interest. The endorsement makes clear that insurance is not extended to property damage *"claimed by [Mainland] or any "co-owner* of the working interest." The modifier "co-" is repeated in succeeding subsections of the endorsement's exclusion and would be superfluous if any and all owners of the working interest, not just those who were co-owners of a working interest along with Mainland or an additional insured, were intended to be included within the exclusion.

This construction of the endorsement's exclusion is also supported by the use of the term "such properties" in the definition of "co-owner of the working interest." The reference to such properties relates back to property damage "claimed by [Mainland] or any 'co-owner of the working interest'" or "incurred by or at the request of [Mainland], additional insureds or any 'co-owner of the working interest'. . . ." "[S]uch property" is not a reference to any and all property on which damage may occur due to Mainland's operations but rather property damage incurred on property in which Mainland or an additional insured has a working interest.

This is a sensible construction of the policy. It insures that Mainland has coverage when it is pursuing drilling operations as a contractor, which is the

11

business for which the commercial general liability policy was obtained.[8]  The policy does not insure Mainland or its co-interest owners when Mainland is drilling or developing an oil and gas property for itself.

Under Texas law, if an insurance contract is susceptible to more than one reasonable interpretation, any ambiguity is resolved in favor of coverage.[9]  I would therefore remand this case to the district court.

### III

The policy issued to Mainland has other ambiguities.  This can be seen when the policy as a whole is examined.

To determine what Mainland's policy provides regarding coverage of the claims against it in the underlying suit, the logical starting point is the Declarations pages.  As already noted, the "Common Policy Declarations" page reflects that Mainland's "Business Description" is "oil/gas well driller", and the "program code" of the policy is "98C–oil & gas".  The "Commercial General Liability Coverage Part Declarations" page reflects that Mainland was charged two premiums for two "classification[s]."  The first classification is "Oil or gas wells–drilling or redrilling–," for which Mainland was charged an annual premium of $16,800, and the second classification is "installation or recovery of casing," for which Mainland was charged an annual premium of $4,200, for a total premium of $21,000. The "Limits of Insurance" section of this Declarations page lists dollar limits of insurance in six categories, including "General Aggregate Limit (Other Than Products–Completed Operations)", with a

---

[8] The "Common Policy Declarations" page of the policy issued to Mainland reflects that Mainland's "Business Description" is "oil/gas well driller".

[9] *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008) ("If an insurance contract uses unambiguous language, we must enforce it as written.  If, however, a contract is susceptible to more than one reasonable interpretation, we will resolve any ambiguity in favor of coverage.").

No. 08-50370

$2,000,000 limit, and "Products Completed Operations Aggregate Limits", with a limit of $2,000,000. The limit for "Each Occurrence" is $1,000,000.[10]

The term "Products-completed operations hazard" is defined in the main body of the policy, and that definition would appear to exclude the claims made against Mainland in the underlying suit because Mainland had allegedly abandoned the work it was performing. The definition in the policy states in pertinent part:

16.    "Products-completed operations hazard":

    a.    Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work"[11] except:

. . .

    (2)    Work that has not yet been completed or abandoned. . . .[12]

    b.    Does not include "bodily injury" or "property damage" arising out of:

. . .

    (2)    The existence of tools, uninstalled equipment or abandoned or unused materials; . . . .

The endorsement at issue, entitled "OIL AND GAS COVERAGE LIMITATION", states that it modifies the insurance that is otherwise being provided. This endorsement then sets forth the exclusion quoted above regarding "Oil and Gas Working Interests" and "Property damage" claimed by

---

[10] There is also a $100,000 limit for "Damage To Premises Rented To You."

[11] The policy defines "Your work" to include "Work or operations performed by you or on your behalf. . . ."

[12] Even this exclusion is arguably ambiguous due to the placement of the word "yet". Grammatically, the policy does not apply to property damage arising out of "[w]ork that has not yet been completed" or "[w]ork that has not yet been . . . abandoned."

Mainland and "any 'co-owner of the working interest.'" That exclusion appears to except from the exclusion property damage "from the blowout or cratering of a well resulting from or in connection with operations performed by [Mainland] or on [Mainland's] behalf unless [Mainland] at [its] own cost and expense, promptly and diligently take[s] whatever steps are necessary or legally required of [Mainland] . . . to bring such well under control." From this section of the policy, it is fair to conclude that Mainland has coverage from claims for property damage resulting from blowouts or cratering, provided Mainland responds appropriately to the occurrence.

However, the next section of the endorsement, regarding "LIMITS OF INSURANCE", seems in tension with, if not in direct conflict with, the foregoing exclusion and its limited exception for blowouts and well cratering. The "LIMITS OF INSURANCE" provision identifies property damage hazards *in addition* to the blowout or cratering of a well, which are the *only* exceptions to the exclusions contained in the first section of the endorsement, if that exclusion applies in circumstance in which Mainland is not the owner or a co-owner of the working interest that is damaged. In addition to blowout and cratering hazards, the "LIMITS OF INSURANCE" section identifies "explosion", "collapse", "saline substance contamination", and "underground resources and equipment" hazards. The limits of liability for property damage resulting from each of these hazards is reduced to $250,000 for each occurrence and $250,000 in the aggregate, as compared to the higher limits of $1,000,000 and $2,000,000, respectively, shown on the Declarations page for "Products Completed Operations Aggregate Limit." The endorsement then adds definitions of each of the hazards identified in the "LIMITS OF INSURANCE" section of the endorsement to the definitions section of the main policy. (These definitions are quoted in part I of this opinion, above, at footnote 2.) It is apparent that hazards are identified other than those that might occur during a blowout or cratering of a well. One example is "Structural

14

property damage," defined as "the collapse of or structural injury to any building or structure due to . . . grading of land, excavating, . . . or . . . [m]oving, shoring, underpinning, raising or demolition of any building or structure. . . ." Another, pertinent to the claims made against Mainland in the underlying suit, is property damage to "any well, hole, formation, strata or area in or through which exploration for or production of any substance is carried on. . . ."

Why would the endorsement take such great pains to define various potential hazards to an oil and gas working interest and place separate dollar limits of liability on these hazards if all but two of them were expressly excluded by the first section of the endorsement? To the extent that the section in the endorsement limits hazards and the succeeding sections expand them, the policy is ambiguous.

The apparent conflict between the exception of only property damage from a blowout or cratering from the exclusions set forth in the first section of the endorsement and the identification of other hazards in the immediately succeeding sections of the endorsement does not appear to be the only conflict. As discussed earlier, the definition of "Products-completed operations hazard", contained in the main body of the policy, includes only damage to property arising out of Mainland's completed work. It specifically excludes "[w]ork that has not yet been completed." Yet, both the definition of "[p]roperty damage" in the exclusion section of the endorsement and the hazards identified in the section regarding "LIMITS OF INSURANCE" in the endorsement, indicate that there is coverage for certain property damage that results from the blowout or cratering of a well. A blowout or cratering of a well would seem to arise in many instances before Mainland completed its work. More pertinent to the present dispute is the question of whether "[u]nderground resources and equipment hazards" are only covered if the property damage occurs after Mainland's work is completed, but are not covered if the property damage occurs before

15

No. 08-50370

Mainland's work is completed or after Mainland abandoned its work under a contract.

## IV

It is far from clear precisely what coverage was extended to Mainland for property damage arising out of its work as a driller of oil and gas wells. I must conclude that the policy is ambiguous in this regard. I would therefore remand this case to the district court for further proceedings consistent with Texas law.