# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00387-CV

---

**Jay C. Chowning and Clifton Chowning, Appellants**

**v.**

**Mark L. Boyer; Laureen Boyer; Lake Austin Storage, LLC; and 2017 River Bend, L.P.,
Appellees**

---

**FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-18-003796, THE HONORABLE TIM SULAK, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

Jay C. Chowning and Clifton Chowning appeal the district court's final order granting summary judgment in favor of Mark L. Boyer; Laureen Boyer; Lake Austin Storage, LLC; and 2017 River Bend, L.P. (collectively, the Purchasers) to enforce a settlement agreement concerning certain real property, a building, and assets at 1215 Terjo Lane in Austin and awarding the Purchasers $29,314 for attorney's fees related to their summary-judgment motion. In seven issues the Chownings challenge the final order; request that we reverse the order and render judgment in their favor based on the alleged invalidity and unenforceability of the settlement agreement; or alternatively, request that we reverse the order and remand this cause to the district court. We will affirm the final order.

# BACKGROUND

In February 2017, the Chownings sold the property, building, and assets at 1215 Terjo Lane to 2017 River Bend, LP, whose general partner is Boyer Properties, LLC, which in turn has two "manager[s]/director[s]," Mark L. Boyer and Laureen Boyer.[1] Until the 2017 sale to the Purchasers, the Chownings operated Lake Austin Storage on the property. To complete their transaction, the parties signed a real property sale contract, an asset purchase agreement for the sale of Lake Austin Storage's assets, and a guaranty agreement executed by Mark L. Boyer, Laureen Boyer, and Boyer Properties, LLC.

Section 12 of the parties' real property contract states that "[a]ll covenants, representations and warranties in this contract survive closing" and that "[i]f any representation of Seller in this contract is untrue on the Closing Date, Seller will be in default." The parties' asset purchase agreement specifies that the "agreement is related to and dependent upon the obligations contained in the Property Contract being fulfilled" and section 5 contains an indemnity provision stating:

> SELLER AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS BUYER FROM ANY ACT OR OMISSION THAT ARISES FROM OR IS RELATED TO THE ASSETS WHICH TOOK PLACE PRIOR TO THE TRANSFER DATE, EVEN IF A CLAIM IS MADE OR A LAWSUIT I[S] FILED AFTER THE TRANSFER DATE. LIKEWISE, BUYER AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS SELLER FROM ANY ACT OR OMISSION THAT MAY TAKE PLACE AFTER THE TRANSFER DATE.

As part of the purchase transaction, Mark and Laureen Boyer issued two promissory notes to Jay C. Chowning and to Clifton Chowning, each for $97,500. Additionally,

---

[1] Mark L. Boyer and Laureen Boyer signed the real property sale contract as buyers. The deed of trust for the property shows that the Boyers each signed as a "manager/director" of Boyer Properties, LLC, the general partner of 2017 River Bend, LP.

Lake Austin Storage, LLC (by Mark and Laureen Boyer as managers) issued a $1 million real estate lien balloon note to the Chownings.

**Disputes Arising After the Sale**

On February 15, 2018, almost one year after the sale, the City of Austin sent a letter to 2017 River Bend, LP attaching an earlier "Stop Work Order" (also known as a "Red Tag") from "09/02/2016" issued for the property and citing four Austin City Code violations.[2] The 2016 Stop Work Order required correction of "all violations before proceeding with any work" on the property and specified that "failure to do so will result in further legal action" by the City, "including criminal penalties and fines of up to $2,000 per day." The parties dispute whether the Chownings disclosed this 2016 Stop Work Order and its cited violations to the Boyers before selling the property in 2017.

On July 19, 2018, the Chownings' counsel sent a letter to Mark and Laureen Boyer stating that they were in default on both of their promissory notes to the Chownings and demanding payment of $176,000 plus $2,000 in attorney's fees within five business days. The letter also said that it "appear[ed]" that the maturity date on both promissory notes had been altered to April 1, 2022, without the Chownings' knowledge or consent after the Chownings signed the promissory notes but before closing and delivery of the promissory notes to the title company.[3] The letter alleged that "[e]ither those alterations were made with the assistance of counsel with [the Boyers'] knowledge, or they were made without [the Boyers'] knowledge" but

---

[2] The code violations cited in the Stop Work Order are: "No site plan," "No certificate of occupancy," "No water quality pond," and "Impervious cover."

[3] The letter claims that the promissory notes "agreed to and signed by the [Chownings] required payment in full of the entire outstanding principal within approximately 30 days following the closing of the related real estate transaction" in 2017.

3

that regardless, "there appear[ed] to be fraud involved" in the alterations of the promissory notes.[4] On July 23, 2018, the Boyers gave an $88,000 check to Jay Chowning and a $64,303.69 check to Clifton Chowning. Including an offset of $23,696.31 for two barges that the Boyers built for the Chownings, the payments totaled $176,000.[5] The Chownings state that they did not accept or cash those two checks from the Boyers.

**The Underlying Litigation**

On July 25, 2018, the Purchasers sued the Chownings over the 2016 Stop Work Order and asserted claims for breach of contract, fraud in a real estate transaction, and fraudulent inducement. The Purchasers also sought a declaratory judgment to rescind the sale of the property. They alleged that they would not have bought the property if they had known about its issues and that despite providing the Chownings with written notice of "the problems created by these pre-existing conditions" and an opportunity to cure them, the Chownings failed to do so. The Chownings filed counterclaims for breach of contract, fraudulent alteration of a negotiable instrument, common-law fraud, and fraud in a real estate transaction alleging that the Purchasers, "or someone employed or associated with" them, had altered the maturity date on the two $97,500 promissory notes to the Chownings.

---

[4] The Boyers' counsel at closing did not represent them in the district court and does not represent them on appeal.

[5] Clifton Chowning's January 26, 2018 email to Mark Boyer states,

Please deduct the $23,696.31 from the total amount owed from my portion of the cash balance. I should have told you to contact one of us if the build went much over 10k. I did not say that to you so I will accept the consequences. Thank you again. We love the barges and know they will last a long time.

Jay Chowning was copied on this email.

4

On January 15, 2019, the Chownings' counsel sent the Purchasers' counsel a letter declaring default and providing notice of foreclosure. The letter stated that Mark Boyer had defaulted on the promissory notes to the Chownings, that the balance of the notes was accelerated, and that the property would be posted for foreclosure sale on February 5, 2019. The letter further stated that Mark Boyer's default on those promissory notes meant that he was also in default of the $1 million real estate balloon note from Lake Austin Storage under the terms of a cross-default provision in that note[6] and that the balance of the Lake Austin Storage note was also accelerated.[7]

The Purchasers sought a temporary restraining order preventing the February 5 foreclosure sale, and the district court granted the TRO on January 31, 2019. Docket entries show that the parties agreed to three extensions of the TRO on February 14, April 1, and May 13, 2019. The TRO was extended again on June 27, 2019.[8] Later, the parties attended mediation.

---

[6] The cross-default provision stated:

> If Maker [Lake Austin Storage] defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to it, and the default continues after Payee [collectively, the Chownings] gives Maker written notice of the default and five business day[s] to cure, then Payee may declare the unpaid principal balance and earned interest (if any) on this note immediately due.

[7] The letter stated that the remaining balance under the notes to be accelerated was $1,022,546.06 ($88,000 on each note to Clifton and Jay Chowning and $846,546.06 on the Lake Austin Storage note) plus $3,500 in attorney's fees and demanded payment of the $1,026,046.06 total amount by February 4, 2019, or the foreclosure sale of the property would proceed.

[8] The docket entry does not show whether the parties agreed to this TRO extension.

**The Settlement Agreement**

On August 20, 2019, the parties and the Chownings' counsel[9] signed a "Confidential Settlement Agreement and Mutual Release." The parties' signatures were "evidence of their acknowledgement and consent to the terms set forth" in the settlement agreement. Further, they "agree[d], covenant[ed], and warrant[e]d" that they had "each read and thoroughly underst[oo]d" the agreement and all documents executed in connection with it.

Section I of the settlement agreement is split into two parts: "Payment to the Purchasers" and "Payment to the Chownings." Under the "Payment to the Purchasers" provisions, the Chownings could recover the property and assets if they paid the Purchasers $619,000 and either: (1) returned the barges that the Boyers built and delivered to the Chownings or (2) paid the Purchasers an additional $23,000. Full payment of the settlement sum was due on January 3, 2020. Within twenty-one days of that payment, the parties were required to enter a notice of nonsuit with prejudice as to the pending lawsuit. Further, from the date of the settlement agreement until the date of the Chownings' payment of the settlement sum, the Purchasers were relieved of the obligation to make any additional payments to the Chownings related to the promissory notes, the asset purchase agreement, the guaranty, real property contract, or any other agreement related to the property or Lake Austin Storage. During this time, the Chownings "agree[d] not to pursue foreclosure or any other action related to non-payment" of the promissory notes, the asset purchase agreement, or the real property contract. Lastly, this part of the settlement agreement required the Chownings to return and void the Boyers' checks for $88,000.00 and $64,303.69 by August 30, 2019.

_____

[9] The Chownings had one lawyer representing them when they signed the settlement agreement but substituted a new lawyer four months afterward.

However, if the Chownings failed to pay the settlement sum to the Purchasers by January 3, 2020, the "Payment to the Chownings" provisions of the settlement agreement would be triggered. Under those provisions, the Purchasers could retain the property and assets if they paid the Chownings either: (1) $500,000 between January 3, 2020, and February 2, 2020; (2) $350,000 between February 3, 2020, and March 2, 2020; or (3) $250,000 "on or after March 3, 2020[,] and only in the event that the Chownings have previously failed to timely pay the original settlement sum described above prior to it being tendered." Payment of the first, second, or third alternative settlement sum would constitute "full and final payment" to the Chownings for the property; Lake Austin Storage; "and any other assets or obligations conveyed" in the promissory notes, the asset purchase agreement, the guaranty, and the real property sale contract.

Mutual releases were included in section II of the settlement agreement. These releases applied to all claims asserted in the "Dispute" (relating to the 2016 Stop Work Order and to the payment terms of the promissory notes) and "any and all claims." "Claims" was defined in the settlement agreement as "including but not limited to claims relating to" the sale, promissory notes, the guaranty, the property, and Lake Austin Storage, "as well as other demands, causes of action, damages, injuries, losses, or lawsuits,"

> WHETHER ARISING IN TORT, CONTRACT, NEGLIGENCE, NEGLIGENT MISREPRESENTATION, FRAUD, MISREPRESENTATION, OR FROM STATUTE, INCLUDING ALL OBLIGATIONS AND LIABILITIES OF EVERY KIND AND CHARACTER, RELATING IN ANY WAY DIRECTLY OR INDIRECTLY TO THE LITIGATION THAT HAVE ACCRUED, HAVE BEEN BROUGHT, OR COULD HAVE BEEN BROUGHT PRIOR TO THE DATE OF THIS SETTLEMENT AGREEMENT, REGARDLESS OF CAUSE OR ORIGIN.

Section III of the settlement agreement contained "Additional Terms." Among them was a requirement that the Purchasers provide the Chownings with "the contact information and current rent rolls of tenants occupying the Property prior to September 10, 2019." The Purchasers were also required to "reasonably comply with lender[']s request for access to the Property and additional documents related to the Property and LAS [Lake Austin Storage]." Lastly, section XI of the settlement agreement provided that "[i]n the event a party must sue or move to enforce the other party's obligations under this Settlement Agreement, the prevailing party shall be entitled to recover its costs and attorneys' fees."

**Post-Mediation Procedural History**

On August 22, 2019, two days after the parties signed the settlement agreement, the district court signed an agreed order abating the underlying lawsuit until March 3, 2020—the last date that the Purchasers could retain the property and assets by making payment to the Chownings. The agreed order stated that "the parties expect this matter to be resolved on or before" that date and that they "collectively seek to abate the Lawsuit to accommodate resolution of the dispute." Along with the abatement of "the parties' respective claims and defenses," the agreed order "revoked and rendered ineffective" the scheduling order issued on June 26, 2019.

In December 2019, the Chownings obtained new counsel and filed a motion to lift the abatement and stay so that they could amend their pleadings and the district court could consider a motion to set aside the settlement agreement. The district court denied that motion on January 10, 2020. On March 3, 2020, the Purchasers delivered to the Chownings' counsel a cashier's check for $250,000 to retain the property and assets under the "Payment to the

Chownings" provisions of the settlement agreement. The Chownings state that this $250,000 check was not cashed.

On March 10, 2020, the Chownings filed a motion for partial summary judgment requesting declarations that: (1) the settlement agreement was legally unenforceable as a matter of law; (2) the Purchasers had materially breached the settlement agreement by failing to provide "an accurate tenant Rent Roll" and "the tenants' contact information"; and (3) the settlement agreement was terminated. Further, the Chownings stated that they withdrew their consent to the settlement agreement and without such consent, "the trial court cannot render judgment and may only enforce the settlement agreement as a written contract." The Chownings then contended that the settlement agreement was void and unenforceable as a contract. The Purchasers responded that there was a "valid and enforceable" settlement agreement and that the Chownings had not shown as a matter of law that the Purchasers breached the settlement agreement, particularly given the sufficiency of the rent roll and tenant contact information that the Purchasers did provide to the Chownings. The Purchasers contended that the summary-judgment evidence showed that they had complied with the settlement agreement or, alternatively, that a fact issue existed as to whether there was a breach of the agreement based on the rent roll and tenant contact information they provided to the Chownings.

While that motion for partial summary judgment was pending, on May 1, 2020, the Purchasers filed a motion to enforce the settlement agreement. They stated that "all matters contemplated in this lawsuit have been resolved" and complained that the Chownings failed to enter an "Agreed Notice of Nonsuit" and failed to execute a release of lien after the Purchasers paid the Chownings under the terms of the settlement agreement. The Purchasers requested that the district court order the Chownings to execute and deliver a signed release of lien to them

9

within seven days of the motion-to-enforce hearing. On May 29, 2020, the district court denied the Purchasers' motion to enforce and the Chownings' motion for partial summary judgment.

Four days after these rulings, the Chownings' counsel sent the Purchasers' counsel a notice of default and intent to accelerate, stating that Lake Austin Storage had not made any payments on its $1 million note since July 2019—the month before the parties signed the settlement agreement—and that Lake Austin Storage was "in default for eleven payments" from August 2019 through June 2020. The Chownings' counsel demanded payment of $115,604.61 within one week for past-due payments, late fees, and attorneys' fees, and threatened foreclosure proceedings if that payment was not made.

The Purchasers filed a fourth amended petition on June 9, 2020, this time seeking a declaratory judgment to validate the settlement agreement, pleading a breach-of-contract claim as to the settlement agreement, and requesting injunctive relief to prevent the threatened foreclosure sale. This petition dropped the Purchasers' previously pled claims for fraud in a real estate transaction and fraudulent inducement and their request for rescission of the sale of the property. On the same day, the Purchasers filed a motion for summary judgment based only on the settlement agreement and expressly acknowledging the Chownings' "revocation of consent to the Settlement Agreement." The Chownings filed a response to the motion, and the Purchasers filed a reply.[10]

The district court granted the Purchasers' motion for summary judgment on July 23, 2020, ordering that: (1) the Purchasers retain ownership in "the property subject to this Lawsuit"; (2) the Chownings execute and deliver to the Purchasers a signed release of lien;

_____

[10] The Purchasers' reply was not requested for inclusion in the clerk's record and is omitted from it.

(3) "the Chownings pay reasonable attorneys' fees of $29,314.00 to the Purchasers for fees incurred related to this Motion"; and (4) all claims and counterclaims in the lawsuit were resolved and adjudicated. The Chownings appeal that final summary-judgment order.

## DISCUSSION

In seven appellate issues, the Chownings contend that the district court erred by granting the Purchasers' motion for summary judgment because: (1) the Purchasers failed to prove all elements of a breach-of-contract cause of action; (2) the Purchasers committed material breaches of the purported settlement agreement, or fact issues existed as to whether the Purchasers materially breached the purported settlement agreement; (3) the purported settlement agreement was invalid as a matter of law because it required all money from the sale to be paid to Mark Boyer, who had no standing or legal right to receive the proceeds because 2017 River Bend, LP, owned the real property or assets being sold; (4) the purported settlement agreement was unenforceable as a matter of law because it did not contain all essential elements of a legally enforceable settlement agreement or contract; (5) the Purchasers did not plead or request specific performance in their fourth amended petition and summary-judgment motion, materially breached the purported settlement agreement, had an available legal remedy barring equitable relief, and had unclean hands; (6) the Chownings' counterclaim was not included as part of the settlement terms; and (7) as to the attorney's fees awarded, the Purchasers did not plead and prove presentment or recover any damages, the Chownings' counter-affidavit on attorney's fees created fact issues, and the awarded attorney's fees "greatly exceeded" the scope allowed under the purported settlement agreement. For the following reasons, we disagree and conclude that reversal of the summary judgment enforcing the settlement agreement is not warranted.

11

**Standard of Review**

We review a trial court's ruling granting summary judgment de novo, taking evidence favorable to the nonmovant as true, indulging every reasonable inference in favor of the nonmovant, and resolving any doubts in the nonmovant's favor. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Knott*, 128 S.W.3d at 215-16. If the trial court's order does not specify the grounds for its summary judgment, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Knott*, 128 S.W.3d at 216.

When the summary-judgment evidence establishes an enforceable settlement agreement as a matter of law, the trial court should grant the motion and enforce the agreement. *Padilla v. LaFrance*, 907 S.W.2d 454, 462 (Tex. 1995). Although a trial court may not render an "agreed judgment" on a settlement agreement where consent is lacking, settlement agreements can be enforced as binding contracts, even when one side withdraws consent to the settlement before judgment is entered on the agreement. *See Mantas v. Fifth Ct. of Appeals*, 925 S.W.2d 656, 658 (Tex. 1996); *Padilla*, 907 S.W.2d at 461; *see also* Tex. Civ. Prac. & Rem. Code § 154.071(a) ("If the parties reach a settlement and execute a written agreement disposing of the dispute, the agreement is enforceable in the same manner as any other written contract."). When consent is withdrawn, the party seeking enforcement of the settlement agreement may pursue a separate claim for breach of contract or file a motion to enforce. *See Mantas*, 925 S.W.2d at 658 (stating that action to enforce settlement agreement must be based on "proper

12

pleading and proof" (citing *Padilla*, 907 S.W.2d at 462)); *see also Scott v. American Home Mortg. Servicing, Inc.*, No. 03-14-00322-CV, 2015 Tex. App. LEXIS 12390, at *7 (Tex. App.—Austin Dec. 8, 2015, pet. denied) (mem. op.).

**Settlement Agreement**

Texas courts, including ours, have held that the essential terms for a settlement agreement are the amount of compensation and the liability to be released. *See Padilla*, 907 S.W.2d at 460-61 (concluding that complete and enforceable agreement existed where terms included agreement to pay amount in exchange "for full and final settlement of this case"); *Disney v. Gollan*, 233 S.W.3d 591, 595 (Tex. App.—Dallas 2007, no pet.) (concluding that settlement agreement's essential terms are amount of compensation and liability to be released); *CherCo Props., Inc. v. Law, Snakard & Gambill, P.C.*, 985 S.W.2d 262, 266 (Tex. App.—Fort Worth 1999, no pet.) (holding that settlement agreement that included payment terms and statement that parties would execute mutual releases contained all material terms); *see also Scott*, 2015 Tex. App. LEXIS 12390, at *5, *7 (concluding that agreement contained all "essential terms" to be enforceable because it "recited the terms of appellee's settlement payments and modification of appellants' loan in exchange for appellants' dismissal of their suit with prejudice and release of relevant parties").

Similarly here, summary-judgment evidence included a settlement agreement setting forth the essential terms of the amount of compensation and the liability to be released. As to the amount of compensation, under the third "Payment to the Chownings" provision in section I of the settlement agreement, the Purchasers could retain the property and assets by

13

paying the Chownings $250,000 on or after March 3, 2020, only if the Chownings had not timely paid the original settlement sum before the Purchasers tendered payment:

> If the Chownings fail to pay the Settlement Sum by March 3, 2020, then the Purchasers may pay the Chownings the settlement sum of TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($250,000.00) (the "Third Alternative Settlement Sum"). The Third Alternative Settlement Sum may be tendered on or after March 3, 2020 and only in the event that the Chownings have previously failed to timely pay the original Settlement Sum described above prior to it being tendered.

The summary-judgment evidence includes a copy of a $250,000 cashier's check, showing Lake Austin Storage as the remitter, payable to Jay Chowning and Clifton Chowning, and dated February 27, 2020. The summary-judgment evidence also includes an affidavit from Chad Goldreyer, averring that on the morning of March 3, 2020, he personally delivered the cashier's check to the Chownings' counsel. Although the Chownings state that this $250,000 check was not cashed, they do not dispute that the Purchasers tendered this timely and full payment.

As to the liability to be released, the settlement agreement specified that payment of the $250,000 "third alternative settlement sum" would constitute "full and final payment" to the Chownings for the property, Lake Austin Storage, "and any other assets or obligations conveyed" in the promissory notes, the asset purchase agreement, the guaranty, and the real property sale contract:

> Should the Purchasers pay the First, Second, or Third Alternative Settlement Sum, this sum shall constitute a full and final payment to the Chownings for the Property, LAS [Lake Austin Storage], and any other assets or obligations conveyed in the Promissory Notes, the APA [asset purchase agreement], the Guaranty, and the Property Contract. Accordingly, upon payment of the Alternative Settlement Sum, the Promissory Notes, the APA, the Guaranty, and the Property Contract are fully satisfied and terminated and the Purchasers retain legal title to the Property and LAS with no further encumbrances by the Chownings.

14

The liability to be released is further specified in section III of the settlement agreement, containing the parties' mutual releases. As to the Chownings, this section states:

> Upon execution of the Settlement Agreement, the Chownings, on behalf of themselves as well as their affiliates, subsidiaries, and parents, and their respective officers, shareholders, predecessors, successors, assigns, legal representatives and their former, present and/or future agents and attorneys, do immediately release and forever discharge the Purchasers of and from all claims asserted in the Dispute, and any and all claims, including but not limited to claims relating to the Sale, the Promissory Notes, the Guaranty, the Property, and LAS, as well as other demands, causes of action, damages, injuries, losses, or lawsuits, WHETHER ARISING IN TORT, CONTRACT, NEGLIGENCE, NEGLIGENT MISREPRESENTATION, FRAUD, MISREPRESENTATION, OR FROM STATUTE, INCLUDING ALL OBLIGATIONS AND LIABILITIES OF EVERY KIND AND CHARACTER, RELATING IN ANY WAY DIRECTLY OR INDIRECTLY TO THE LITIGATION THAT HAVE ACCRUED, HAVE BEEN BROUGHT, OR COULD HAVE BEEN BROUGHT PRIOR TO THE DATE OF THIS SETTLEMENT AGREEMENT, REGARDLESS OF CAUSE OR ORIGIN. NOTHING IN THIS SETTLEMENT AGREEMENT CONSTITUTES AN ADMISSION OF LIABILITY AND EACH PARTY RECOGNIZES THIS SETTLEMENT AGREEMENT AS RESOLVING DISPUTED ISSUES OF FACT AND LAW.[11]

*See Marx v. FDP, LP*, 474 S.W.3d 368, 379 (Tex. App.—San Antonio 2015, pet. denied) (concluding that relinquishment of right to pursue disputed claims was sufficient consideration for mediated settlement agreement). Moreover, the settlement agreement provided that the parties' signatures were "evidence of their acknowledgement and consent to the terms set forth" in the settlement agreement, and they "agree[d], covenant[ed], and warrant[e]d" that they had "each read and thoroughly underst[oo]d" the agreement and all documents executed in connection with it. *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) (noting

---

[11] The release in section III as to the Purchasers is identical except for this preface: "Upon timely receipt of payment of the Settlement Sum, the Purchasers on behalf of themselves as well as their affiliates, subsidiaries, and parents, and their respective officers, shareholders, predecessors, successors, assigns, legal representatives and their former, present and/or future agents and attorneys, do release and forever discharge the Chownings . . . ."

15

that "[e]vidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind"). We conclude that the document that the parties and the Chownings' counsel signed at mediation contained all the essential terms for a settlement agreement. *See Padilla*, 907 S.W.2d at 460-61; *Disney*, 233 S.W.3d at 595; *CherCo Props.*, 985 S.W.2d at 266; *see also Scott*, 2015 Tex. App. LEXIS 12390, at *5, *7.[12]

We further conclude that under the express terms in section I of the settlement agreement—by tendering the $250,000 payment to the Chownings on March 3, 2020, after the Chownings had failed to pay their settlement sum—the Purchasers: (1) made "full and final payment to the Chownings for the Property, LAS, and any other assets or obligations conveyed in the Promissory Notes, the APA, the Guaranty, and the Property Contract"; (2) "fully satisfied and terminated" the promissory notes, the asset purchase agreement, the guaranty, and the property contract; and (3) retained legal title to the Property and Lake Austin Storage "with no further encumbrances by the Chownings." With that payment from the Purchasers, the settlement agreement provided that there would be "no further encumbrances by the Chownings" to the Purchasers' retention of legal title to the property and Lake Austin Storage assets. Further, by executing the settlement the Chownings agreed to the broad release quoted above, stating in part that the Chownings "release[d] and forever discharge[d] the Purchasers of and from all claims asserted in the Dispute, and any and all claims, including but not limited to claims relating

---

[12] The Chownings complain that the settlement agreement failed to include a time for performance to occur. However, the Purchasers' performance by tendering payment in full on March 3, 2020, complied with the third "Payment to the Chownings" provision, and nothing in the settlement agreement expressly provided that time was of the essence. *See Deep Nines, Inc. v. McAfee, Inc.*, 246 S.W.3d 842, 846 (Tex. App.—Dallas 2008, no pet.) (noting that generally, time of performance is not material term of agreement unless contract specifies that time is of the essence or contract shows parties' intention that time be of the essence). In the context of this agreement, we conclude that time of performance was not an "essential term," and its omission did not invalidate the settlement agreement.

16

to the Sale, the Promissory Notes, the Guaranty, the Property, and LAS." It is undisputed that the Chownings did not release their claims to the property and Lake Austin Storage or dismiss their counterclaims, which clouded the Purchasers' title and constituted a breach of the settlement agreement. Rather, the Chownings' response to the summary-judgment motion specified that they "have made the election to terminate the purported Agreement and their performance," if "there ever was a legally binding and enforceable settlement agreement."

The Chownings contend that their performance was excused because the Purchasers materially breached the settlement agreement first by not providing a "rent roll" and tenants' contact information, including a phone number and email address for each. However, the Chownings' own evidence shows that the Purchasers provided the Chownings with such contact information by providing the tenants' mailing addresses and a rent roll of all tenants who occupied the property prior to September 10, 2019. Further, the "Additional Terms" in section III of the agreement refers to "contact information" generally and does not specify that mailing addresses are insufficient or that phone numbers and email addresses must also be provided.[13]

**Attorney's Fees**

The Chownings also contend that the award of attorney's fees was improper because the prerequisites for such an award under chapter 38 of the Texas Civil Practice and Remedies Code were not met and their counsel's counter-affidavit created a fact issue as to the

---

[13] The summary-judgment evidence provided by the Chownings includes a letter in which the Purchasers requested that the Chownings' financial institutions or lenders who might facilitate the financing of the Chownings' settlement-sum payment contact the Purchasers' counsel to ensure that any reasonable lender request for information was handled timely. The letter noted that the prospective lenders should not need to contact individual tenants directly.

17

amount awarded. *See* Tex. Civ. Prac. & Rem. Code §§ 38.002 (addressing procedure for recovery of attorney's fees), .006 (providing that presumption that usual and customary attorney's fees for certain claims are reasonable may be rebutted). The district court ordered "the Chownings [to] pay reasonable attorneys' fees of $29,314.00 to the Purchasers for fees incurred related to this Motion." It did not specify that the award was under chapter 38. Under section XI of the settlement agreement, if a party sued or moved to enforce the other party's settlement obligations and prevailed, recovery of costs and attorneys' fees was authorized: "In the event a party must sue or move to enforce the other party's obligations under this Settlement Agreement, the prevailing party shall be entitled to recover its costs and attorneys' fees." Thus, as the Purchasers correctly contended, the settlement agreement provided an independent basis for the award, apart from the provisions of chapter 38. *See Knott*, 128 S.W.3d at 216 (stating that if trial court's order does not specify grounds for its summary judgment, we must affirm it on any meritorious theory presented to trial court and preserved for our review); *Fitzgerald v. Schroeder Ventures II, LLC*, 345 S.W.3d 624, 629 (Tex. App.—San Antonio 2011, no pet.) (concluding that under contract with "prevailing party" provision, parties who successfully defended claims against them were entitled to attorney's fees).

The Purchasers' counsel provided an affidavit explaining the attorney's fees incurred to enforce the settlement agreement and attached billing records supporting the claimed amount of $29,314. The Chownings' counsel filed a counter-affidavit, contending that the fees sought were unreasonable, lacked credibility, were legally unrecoverable, and "[t]he only fees that could be reasonably related to 'suing' or 'moving' to enforce the settlement agreement are for preparing [the Purchasers'] Motion to Enforce Settlement Agreement, which was denied on May 29, 2020." That restrictive opinion about the recoverable attorney's fees is inconsistent

18

with the settlement agreement that governs the award of attorney's fees here. It authorizes recovery for a party that "must sue or move to enforce the [Chownings'] obligations under th[e] Settlement Agreement." Although the settlement agreement does not address and thus does not expressly require the reasonableness of those recoverable fees, the district court specifically ordered payment of "reasonable attorneys' fees of $29,314.00." Moreover, the counter-affidavit includes immaterial complaints about "appellate attorney's fees" that were not in the district court's order. Having reviewed the evidence, we conclude that the Chownings' counsel failed to raise a genuine issue of material fact as to the propriety of the $29,314 award of attorney's fees incurred because the Purchasers had to "sue or move to enforce the [Chownings'] obligations under th[e] Settlement Agreement."

**Other Contentions**

Finally, none of the Chownings' remaining contentions show their entitlement to reversal of the summary judgment. There is no merit to the contention that the settlement agreement was "invalid as a matter of law" because it required the Chownings to pay the settlement sum of money to Mark Boyer, instead of 2017 River Bend, LP, which owned the real property or assets. As the summary-judgment evidence shows, 2017 River Bend, LP's general partner is Boyer Properties, LLC, and Mark Boyer—a party to the underlying suit—is a manager/director of that entity. Additionally, the contention that the Purchasers did not plead or request specific performance in their live pleading is immaterial because the Purchasers sought only to enforce the express terms of the settlement agreement to clear the title to property and assets that they had already bought, there was no transfer of ownership, and the district court made no order of the equitable remedy of specific performance. Finally, the contention that the

19

Chownings' counterclaims were not included as part of the settlement terms runs contrary to the plain language in section III of the settlement agreement quoted more fully above, in which the Chownings released and forever discharged the Purchasers "of and from *all claims* asserted in the Dispute, and *any and all claims*, including but not limited to claims *relating to* the Sale, the Promissory Notes, the Guaranty, the Property, and LAS as well as other demands, causes of action, damages, injuries, losses, or lawsuits."  (Emphases added.)

In sum, we conclude that the Purchasers established as a matter of law that the "Confidential Settlement Agreement and Mutual Release" signed by the parties and the Chownings' counsel on August 20, 2019, was an enforceable settlement agreement and that the Chownings did not raise a genuine issue of material fact as to whether the agreement was unenforceable.  We further conclude that the Chownings did not raise a genuine issue of material fact as to whether they were excused from their obligations under the agreement because of an alleged material breach of the settlement agreement by the Purchasers.  Accordingly, we overrule the Chownings' seven issues challenging the summary judgment enforcing the settlement agreement.

**CONCLUSION**

We affirm the district court's July 23, 2020 final order granting summary judgment.

20

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Triana, and Smith

Affirmed

Filed:   July 30, 2021